Randy T. Austin (6171)
Wade L. Woodard (18155)
Justin W. Starr (10708)
Michael D. Johnston (11273)
Kirton McConkie
36 S. State St., Ste. 1900
Salt Lake City, UT 84111
(801) 328-3600
raustin@kmclaw.com
wwoodard@kmclaw.com
jstarr@kmclaw.com
mjohnston@kmclaw.com

Steven B. Andersen, *admitted pro hac vice*
Haley K. Krug, *admitted pro hac vice*
Kirton McConkie
1100 W. Idaho St., Ste. 930
Boise, ID 83702
(208) 370-3325
sandersen@kmclaw.com
hkrug@kmclaw.com

*Attorneys for Plaintiff, The Church of Jesus Christ of Latter-day Saints*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH**

| | |
|---|---|
| THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; AND ACE PROPERTY AND CASUALTY INSURANCE CO.,<br><br>Defendants. | Case No. 2:21-cv-00582-TC-CMR<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION FIRE INSURANCE COMPANY** |

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST NATIONAL UNION

## I.    INTRODUCTION

National Union offers no legal authority to support its interpretation of the Policy language governing the payments the Church may use to satisfy the Retained Limit.  And its "plain language" analysis ignores key policy terms and grafts meaning onto others that isn't clearly called for by the words used.  Knowing its interpretation cannot prevail given Utah's longstanding rules of policy interpretation, National Union makes several attempts to avoid application of those rules. The Court should reject them all.

First, National Union tries to create the appearance of a factual dispute by characterizing the Church's motion as seeking a ruling on indemnity.  But the Church seeks a declaratory judgment only on policy meaning, not a final ruling on the duties to defend or indemnify. (National Union does not dispute that if it did in fact owe a duty to indemnify, it also owed a duty to defend.)

Second, National Union asks the Court to dispense with the long-settled rule of *contra proferentem*—interpretation of ambiguous policy terms against the insurer—to avoid the inevitable result of its failure to draft clear policy language.  The so-called "sophisticated entity" exception that National Union relies on has never been adopted in Utah.  And courts that do apply that exception do so only when there is evidence the insured dictated policy terms or at least played an actual role in drafting and negotiating them.  There is no such evidence in the record here.

Ultimately, the Court's task on this motion is simple.  The Court must construe the Policy language to determine whether the Policy unambiguously permits the Church to use payments made for covered losses for other occurrences to exhaust the retained limit, or whether the Policy unambiguously says only the payment made to settle P.C.'s claim exhausts the retained limit.  If the policy language could reasonably be read either way, the Court must interpret the Policy in the

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 1

Church's favor. Here, the Church has offered at least a reasonable interpretation, and the Court must find in its favor as a matter of law.

And if the Church prevails on the retained limit issue, whether the Underlying Lawsuit constitutes a single occurrence or multiple occurrences is a moot question. But if the Church may not use payments toward other occurrences to satisfy the Retained Limit, that question must be resolved. If the Underlying Lawsuit constitutes a single occurrence, the Church clearly satisfied the Retained Limit under National Union's Policy. The legal authority on single-versus-multiple occurrences strongly favors the Church. The Court should find the Underlying Lawsuit was one occurrence.

In a final effort to evade its obligations to the Church under the Policy, National Union suggests it *may* rely on certain Policy exclusions if the Court does not decide in its favor on the other coverage questions raised in the Church's motion. That tactic must fail. The Church has moved for summary judgment on the exclusions National Union itself raised in its denial correspondence. National Union cannot avoid summary judgment by claiming it has not yet denied the claim, over five years after it was tendered and in the midst of coverage litigation.

One of those exclusions—the expected/intended exclusion—warrants further discussion. No fact examination is necessary to decide that issue. National Union *agrees* with the Church that only the intent of high-ranking Church officers can be considered in determining whether the exclusion applies. And National Union has presented no evidence any high-ranking Church officers were involved in the circumstances surrounding the Underlying Lawsuit at all, let alone that they intended to harm the underlying claimants. The Court must reject National Union's attempts to delay ruling on this issue and find the expected/intended exclusion does not apply.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 2

## II.      RESPONSE TO ADDITIONAL STATEMENT OF FACTS

**A.      Paragraphs 8-17 and 22-26 State Immaterial Alleged Facts About Potential, not Actual, Evidence.**

National Union repeatedly quotes or refers to the Amended Complaint in the Underlying Lawsuit and an opinion from the West Virginia Supreme Court of Appeals ("WVSCA Opinion") for "facts" that supposedly create a disputed issue of fact regarding application of the "expected/intended" exclusion in the National Union policy.  The Church does not dispute that the Amended Complaint and WVSCA Opinion say what they say.  But what they say is irrelevant to the expected/intended exclusion, which depends on actual facts.  Accordingly, the Church disputes the *materiality* of paragraphs 8-17 and 22-26 of National Union's Statement of Additional Facts.

**B.      Paragraphs 18-21 State Immaterial Alleged Facts About Jensen's Parents' Knowledge.**

National Union also quotes a Sexual Behavior Risk Assessment ("SBRA") conducted as part of a juvenile court proceeding in Provo, Utah, after Michael Jensen forcibly groped two same-age female classmates.  Plaintiffs in the Underlying Lawsuit alleged that Michael's *parents* saw the SBRA and therefore should have foreseen that he might molest them.  National Union cites those allegations as part of its expected/intended defense.  The Church does not dispute that the SBRA says what it says.  Nor, for purposes of this motion, does the Church dispute that Michael's parents *might* have seen the SBRA.  But for reasons explained below, what Michael Jensen's *parents* knew about him is immaterial to whether the Church expected or intended any harm.  Accordingly, the Church disputes the *materiality* of paragraphs 18-21 in National Union's Statement of Additional Undisputed Facts.

### III.    REPLY

**A.    The Church Seeks a Declaratory Judgment on Policy Meaning, not a Ruling on National Union's Obligation to Defend or Indemnify the Church.**

National Union asks the Court to deny the Church's motion for summary judgment because, it claims, the Church has not proven it has satisfied the Policy's retained limit.  National Union Opposition to Church Motion for Partial Summary Judgment ("NU Opp."), at 1, 15 [Dkt. 67].  National Union misconstrues the Church's motion.  The Church does not seek a ruling on whether it has in fact satisfied the retained limit by making payments for unrelated covered injuries and damage taking place in the National Union Policy period.  *See* Church Motion for Partial Summary Judgment Against National Union ("Church Mtn."), at 2 n.2 [Dkt. 42].  Instead, it simply asks the Court to interpret the provisions of the Policy bearing on how the retained limit may be satisfied, and to declare that the Policy permits the use of payments for unrelated covered losses for that purpose.  This is an appropriate and routine use of the Declaratory Judgment Act.  *See Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989) (holding the relief granted on a claim for declaratory judgment "need not entirely dispose of the matter . . . [f]urther necessary and proper relief based on factual disputes not yet resolved may be sought at a later time").  Accordingly, the Church need not, as National Union contends, prove actual exhaustion of the Policy's retained limit to prevail on its motion for summary judgment.

**B.    The Policy Permits the Church to Satisfy the Retained Limit by Payments for Unrelated Losses.**

    **1.    The Theoretical Difference Between a Deductible and a Retained Limit Is Irrelevant; What Matters Is Policy Language.**

National Union begins by appealing to the general purposes of deductibles and retained limits, arguing that the Church "erroneously treats the National Union Umbrella Policy as if it is

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 4

primary coverage subject to a deductible, and not an excess insurance policy that provides coverage only upon exhaustion of a retained limit." NU Opp. at 15-16. National Union mischaracterizes its Policy—it is an umbrella policy that does provide primary coverage in some instances. But this dispute is a distraction. The Church concedes it must satisfy a retained limit before it is entitled to coverage under the Policy. It is not seeking "primary" coverage. The question is how the Policy permits the retained limit to be satisfied. That question can only be answered by closely examining the Policy language.

2.      **National Union's Structural Argument Fails.**

National Union does not dispute that courts apply a broad and inclusive meaning of "any" in interpreting insurance policies. It nevertheless asks the Court to disregard the Policy's clear "any payment" language and says the Church has ignored its context. NU Opp. at 16. National Union argues "any payment" means "any payment for the same occurrence" because "any payment" is "contained in a provision referring to the different sources of payment *for a Loss within the Retained Limit* that may be applied toward its exhaustion—such as if the Church has other insurance coverage within the Retained Limit to pay for a particular Loss." *Id.* at 2. The Policy does provide that "any payment" from either an Insured or another insurer toward covered loss can be used to "reduce[] or exhaust[]" the Retained Limit, but there is no requirement that such payments, in either case, be made toward loss arising from the same occurrence.

Despite the absence of any "same occurrence" language, National Union contends the phrase "within the above Retained Limits" has the effect of "same occurrence" language because it incorporates the phrase " █████ EACH OCCURRENCE" from the Schedule of Retained Limits. Thus, National Union contends the "any payment" clause, incorporating this language,

reads: "The above ███████ EACH OCCURRENCE may be reduced or exhausted by . . . [a]ny payment by or on behalf of the Insured of loss that would be insured by our policy within the above ███████ EACH OCCURRENCE . . . ."

National Union is wrong. The definition of Retained Limit in paragraph Z of Endorsement 17 does not incorporate the language listed under the "Retained Limit(s)" heading into paragraph Z. Instead, paragraph Z uses the word "limit(s)" with a lowercase "l": "Retained Limit means the applicable *limit(s)* listed in the Schedule of Retained Limits . . . ." Joint Submission Ex. 1 ("Policy"), at Endt. 17 ¶ Z. Limit(s) with a lowercase "l" is an undefined term in the Policy. *See generally* Policy. As such, it takes on its ordinary meaning, not the special meaning applied to the defined term "Retained Limit(s)" in the Schedule of Retained Limits. *MusclePharm Corp. v. Liberty Ins. Underwriters, Inc.*, 712 Fed. Appx. 745, 754 (10th Cir. Oct. 17. 2017); *Bear River Mut. Ins. Co. v. Williams*, 153 P.3d 798, 801 (Utah App. 2006).

The ordinary meaning of the word "limit," is "amount." Limit, Dictionary.com, *available at* www.dictionary.com/browse/limit (last visited June 26, 2023) (defining "limit" as "the final, utmost, or furthest boundary or point as to extent, amount, continuance, procedure, etc."). Accordingly, paragraph Z is appropriately read as "Retained Limit means the applicable *amount(s)* listed in the Schedule of Retained Limits . . . ." The amount of the applicable Retained Limit is ███████. The "EACH OCCURRENCE" language signifies what the amount applies to, *i.e.*, each occurrence (as opposed to, for example, "each claim"). If National Union wanted to incorporate the entire phrase "███████ EACH OCCURRENCE" into the definition of Retained Limit in paragraph Z, it needed to use the term "Retained Limit(s)" where it used the term "limit(s)." National Union rightfully places importance on its choice of terms in the Policy—

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 6

and its choice to refer simply to the amount of the retained limit here must be given effect. Accordingly, the "any payment" language, in referring to the "above Retained Limits," defined in paragraph Z as "limits," simply provides that "any payment" for covered loss within the ████████ amount can be used to exhaust the Policy's Retained Limit.

Moreover, even if the Policy could be read to incorporate the "EACH OCCURRENCE" language into the definition of Retained Limit, that language does not impose a plain requirement that the Church exhaust the Retained Limit by payments made toward loss arising from the same occurrence. A reasonable, plausible interpretation of the "each occurrence" language in the Scheduled of Retained Limits is simply that the Church must pay the specified retained limit for "each occurrence" *for which it seeks coverage under the Policy*. Here, the Church seeks coverage against National Union only for the bodily injury to P.C. The "each occurrence" language requires the Church to pay the applicable retained limit amount for covered claims in the National Union policy period before it can recover for the settlement paid to P.C. but does not require that the retained limit be satisfied by only that settlement.

The reasonableness of the Church's position is clear when National Union's Policy language is compared to that of other umbrella policies triggered by the satisfaction of a retained limit. Policies that have the "same occurrence" requirement National Union seeks to impose here invariably use clear language that requires not only that retained limit payments be made for each occurrence, but also that the payments all must arise from, be caused by, or be incurred on account of that same occurrence:

- "The amount stated in the Special Declarations as Self Insured Retention ***as a result of any one*** Occurrence . . . ." *Indem. Ins. Co. of N. Am. v. W&T Offshore*, Inc., 756 F.3d 347, 350 (5th Cir. 2014) (emphasis added).

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 7

- "[T]he sum of all damages for 1. Bodily injury . . . *arising out of each such occurrence*." *Anchorage Sch. Dist. v. Starr Indem. & Liab. Co.*, 287 F. Supp. 3d 756 (D. Alaska 2018) (emphasis added).

- "[T]he amount of the underlying limits *on account of such occurrence*." *Appalachian Ins. Co. v. Gen. Elec. Co.*, 8 N.Y.3d 162, 168 (N.Y. 2007) (emphasis added).[1]

In other words, there is causation language that links the amount language and the occurrence language, making clear the amount paid must be attributable to the same occurrence.

There is no such language in National Union's Policy, and National Union cites no legal authority that prohibits or even casts doubt upon the Church's reasonable interpretation of the language at issue here. The Court should find that the National Union Policy permits the Church to satisfy the Retained Limit by use of payments toward covered loss for unrelated occurrences in the National Union Policy period.

### 3.      Any Ambiguity Must Be Construed in the Church's Favor Under Utah Law.

Utah law is clear that ambiguities in an insurance policy must be construed in favor of coverage. *U.S. Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 522-23 (Utah 1993). The Court should reject National Union's request to ignore this rule because this is a manuscript policy or because the Church is a "sophisticated" entity. *See* NU Opp. at 13. There is no published Utah state or federal court decision that limits this well-settled interpretive rule in any way. And some

---

[1] The Church's citation to these cases is not "extrinsic evidence." *See* NU Opp. at 25. It presents the Court with examples of how other courts have interpreted related policy provisions as a matter of law (not evidence). National Union would have this Court rule that courts are not permitted to consider the language of other insurance policies to conduct their policy interpretation exercises, or at least not language that is not identical to the language in question. Such a rule would contravene the methodology employed by thousands and thousands of published decisions across the country and severely handicap insureds in cases like this one, where there is no published case law discussing the precise language in question. This Court should reject National Union's attempt to limit the sources of legal authority the Court may look to in making its decision.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 8

jurisdictions reject the proposition outright. *Economy Premier Assurance Co. v. W. Nat'l Mut. Ins. Co.*, 839 N.W.2d 749, 755 (Minn. App. 2013) (holding the rule of *contra proferentem* applies "even to disputes involving a sophisticated insured with equal bargaining power" because insurers are "in a better position to prevent misunderstandings, to avoid including ambiguities"); *see also Boeing Co. v. Aetna Cas. & Ins. Co.*, 784 P.2d 507, 883 (Wash. 1990) (rejecting insurer's attempt to avoid insured-friendly policy interpretation rules on the grounds the insured was a "corporate giant").

Even those courts that apply a sophisticated-entity exception to the rule of *contra proferentem* do so only where there is evidence the so-called sophisticated insured had superior bargaining power and actually used it to draft policy provisions jointly with the insurer. National Union's own cited cases explain this well. The court in *AIU Ins. Co. v. Superior Ct.* expressly rejected the insurer's request to dispense with the rule of *contra proferentem* in a case involving a sophisticated insured because there was no evidence the insurance policy was "actually negotiated and jointly drafted." 51 Cal. 3d 807, 822 (Cal. 1990). Without evidence that the parties "intended the provisions at issue here to carry technical meanings and implemented this intention by specifically crafting policy language," the court found "little reason to depart from ordinary principles of interpretation." *Id.* at 823.

The court in *Gabarick v. Laurin Maritime (Am.), Inc.* did not dispense with the rule of *contra proferentem* but instead held the policy language was unambiguous and applied its plain meaning. 650 F.3d 545, 555-56 (5th Cir. 2011). Although the court did, in *dicta*, state that "Louisiana's presumption in favor of the insured does not apply where the insured is a sophisticated commercial entity that drafted the policy or used an agent to secure the desired policy provisions,"

the court cites only to another Fifth Circuit case interpreting Louisiana law for that proposition. *Id.* at 553 n.22. There are other Fifth Circuit cases holding, like the California Supreme Court in *AIU*, that the mere involvement of a broker is not enough to dispense with the rule—there must be evidence the broker "enjoyed superior bargaining power or was able to dictate the terms of the policy." *Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co.*, 857 F.2d 286, 288 (5th Cir. 1988); *see also Certain Underwriters at Lloyds London v. Perraud*, 623 Fed. Appx. 628, 633 (5th Cir. 2015) (acknowledging no Texas court had applied a sophisticated-entity exception to the rule of *contra proferentem* and finding that even if one had, the court would not apply it '[a]bsent any information about the content of the negotiations, how the contracts were prepared, or other indicators of relative bargaining power, Underwriters did not present evidence that the insured did or could have influenced the terms" of the policy).

In this case, there is no evidence the Church was especially sophisticated on insurance issues when it purchased the Policy, let alone that it had superior bargaining power, jointly drafted the Policy with National Union, or had any ability to dictate the Policy's terms. Even if Utah law did apply a sophisticated-entity exception to the rule of *contra proferentem*—which it does not—there would be no basis to apply such an exception here. The Church's interpretation of National Union's policy language governing the application of the Retained Limit is reasonable, so the policy is at least ambiguous on this point. The Court should apply the law on ambiguity as repeatedly expressed by the Utah courts and construe any Policy terms that it deems ambiguous in favor of coverage.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 10

**C.      Alternatively, There Was a Single "Occurrence" under the Policy, and the Church Satisfied the Retained Limit for that Occurrence.**

**1.      National Union Misapplies the Cause Test.**

National Union acknowledges "Utah courts apply the 'cause' test" to determine the number of occurrences.  NU Opp. at 23.  But National Union's analysis misapplies the cause test.  And the case National Union cites, *Taylor v. American Fire & Cas. Co.*, 925 P.2d 1279 (Utah App. 1996), has nothing to do with the cause test.  Properly applied, the cause test looks at the *insured's* conduct, not at "the most immediate cause of the harm."  *Donegal Mut. Ins. Co. v. Baumhammers*, 893 A.2d 797, 815 (Pa. Super. 2006).  The insured's conduct is the "occurrence that gives rise to insurance coverage."  *RLI Ins. Co. v. Simon's Rock Early Coll.*, 765 N.E.2d 247, 250 (Mass. App. 2002).  Thus, "when the issue is the number of occurrences, we must look to the 'cause' of the injury by reference to the conduct of the insured for which coverage is afforded, and that 'cause' and 'occurrence' are indistinguishable for purposes of this analysis."  *Id*. at 251.[2]

The cause test was properly applied In *Washoe County v. Transcontinental Ins. Co.*, 878 P.2d 306 (Nev. 1994), which involved sexual abuse of several children caused by the county's continuing negligence.  The court explained why the insured's conduct is the key to determining the number of occurrences:

---

[2] *See also* Sharon Abidor, *Traveling Outside the Insurance Contract; the Problems with Maximizing Victim Compensation: Koikos v. Travelers Insurance Company*, 10 Conn. Ins. L.J. 349, 354 (2004) ("By focusing on the underlying cause, the policyholder's reasonable expectations to receive coverage are honored, since this analysis focuses on the tortious omission of the policyholder as opposed to the intentional harm and damage done by a third party, not covered by the insurance policy."); Tung Yin, *Nailing Jello to A Wall: A Uniform Approach for Adjudicating Insurance Coverage Disputes in Products Liability Cases with Delayed Manifestation Injuries and Damages*, 83 Cal. L. Rev. 1243, 1257–58 (1995) ("An insured's selection of a 'per occurrence' rather than a 'per claim' policy should suggest that it wants coverage to be measured by the underlying circumstances that result in the claim for damages: the proximate cause.").

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 11

> [E]ven though the action of the individual wrongdoer[ ] [is] the most direct cause[] of harm for the victims … the actions of the individual wrongdoer[ ] taken alone are not the basis of liability . . . Instead, liability . . . is premised on the [county's] negligence in performing a duty, which permitted the intervening conduct of [the wrongdoer] who actively caused the victim's harm.

*Id*. at 310. National Union notes that *H.E. Butt Grocery Store v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526 (5th Cir. 1998) ("*HEB*"), declined to follow *Washoe* because *Washoe* "attempt[s] to avoid the inescapable fact that the sexual molestation caused the injuries." *Id*. at 534. But the insured's negligence *also* caused the injuries, and the insured's negligence—not the perpetrator's crimes—is the insured "occurrence." *HEB* "ignores the fact that the issue to be determined is not liability, but the contractual obligation of an insurer to an insured." *Simon's Rock Early Coll.*, 765 N.E.2d at 250 n.2 (emphasis added).

National Union's approach turns Michael Jensen's criminal conduct into the insured "occurrence." The Church is the insured party. Therefore, the Church's alleged "negligent hiring or negligent supervision" of Michael Jensen is the insured "'occurrence.'" *Safeco Ins. Co. of Am. v. White*, 913 N.E.2d 426, 432 (Ohio 2009). And, with the focus on the Church's conduct, the number of occurrences becomes clear. The National Union Policy defines "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and further explains that "[a]ll such exposure to substantially the same general harmful conditions will be deemed to arise out of one occurrence." Courts interpreting this language have repeatedly held that "a series of related acts of negligence . . . are considered a single 'occurrence' for the purposes of determining coverage." *Hollis v. Lexington Ins. Co.*, 180 F. Supp. 3d 422, 430 (E.D. Va. 2016) (quotations omitted), *aff'd* 682 F. App'x 206 (4th Cir. 2017); *accord Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 747 F. Supp. 618, 625 (D. Or. 1990); *Washoe*, 878

P.2d 306; *State Farm Fire & Cas. Co. v Elizabeth N.*, 9 Cal. App. 4th 1232, 1236, 1238 (1992); *Gen. Acc. Ins. Co. of Am. v. Allen*, 708 A.2d 828, 833 (Pa. Super. 1998).

At the very least, these cases establish that the Church's position is plausible and reasonable. And as National Union concedes, Utah law requires courts to accept an "alternate plausible" interpretation that favors coverage. NU Opp. at 25 (quoting *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 433 (Utah 2006)). The cases National Union relies on acknowledge this. In *Soc'y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, the court found that a reasonable interpretation of "occurrence" was that "the church's continuous negligent supervision of a priest" who molested 31 children over seven years was a single occurrence. 26 F.3d 1359 (5th Cir. 1994). The court would have adopted that interpretation if it favored coverage. *Id.* Likewise, in *S.F. v. West Am. Ins. Co.*, the court said the insured's "negligent supervision" of its resident manager, who molested several children resulting in seven lawsuits, "could be deemed" a single occurrence. 463 S.E.2d 450, 465 (Va. 1995). The court did not adopt that interpretation only because it did not favor the insured. *See id.*

One last case makes exactly this point. In *Scott Fetzer Co. v. Zurich Am. Ins. Co.*, the insured's employee assaulted three women "on numerous occasions between May 2012 and January 2013." 769 Fed. App'x. 322, 323 (6th Cir. 2019). The women sued the insured employer for negligent hiring and supervision. The insured argued there was one occurrence. The district court said there were three occurrences. The Sixth Circuit reversed "because under Ohio law . . . an insurer attempting to defeat coverage must show that its interpretation of the insurance contract is the only reasonable interpretation." *Id.* at 323. Noting that "some courts have interpreted the word 'occurrence' to refer to the insured party's negligent hiring and supervision even when

multiple parties have been harmed," the court said there was "more than one way to interpret the word 'occurrence.'" *Id.* at 326-27. The insured argued that its negligent hiring and continuous negligent supervision of its employee was a single occurrence. The court held that "[the insured's] burden is not to prove that its reading is the most reasonable one. [It] need only prove that its reading is *a* reasonable one—*and it has the case law to do just that*." *Id.* (emphasis added).

Here, plaintiffs in the Underlying Lawsuit alleged that the Church's continuous negligent failure to properly supervise and control Michael Jensen caused their injuries. None pointed to a single negligent act. Each pointed to the same series of similar negligent acts. Under the plain language of the Policy, the Church's liability arose from a single occurrence. At the very least, the Church's interpretation is "plausible." The Church "has the case law to [prove] just that." *Id*.

### 2.      A Single Occurrence Means a Single Retained Limit.

National Union correctly asserts that its retained limit "applies on an each Occurrence basis." NU Opp. at 1. Inexplicably, however, National Union also contends that "a separate Retained Limit applies to . . . each policy period." *Id.* at 28. Thus, according to National Union, "even if the abuse of all nine victims in the W. Va. Abuse Lawsuit is considered to constitute a single Occurrence," a retained limit applies to each triggered policy, requiring the Church to satisfy the retained limits under not only National Union's Policy but also ACE's triggered policies, before the Church can recover under any one policy.

National Union's argument is unsupported by citation to policy language or legal authority and is incorrect. The Church addressed this issue in its Motion for Partial Summary Judgment against ACE and incorporates that argument by reference here. Plaintiff's Motion for Partial Summary Judgment Against Defendant ACE, at 27-32 [Dkt. 43]. To summarize, both the National

Union and ACE policies plainly impose a single retained limit of ▮▮▮▮▮▮▮ for "each occurrence."  Courts that have analyzed the issue of how "each occurrence" retained limits apply when a single occurrence triggers multiple, successive policies have found that only a one retained limit should apply.  *Va. Sur. Co. v. Lexington Ins. Co.*, 2011 WL 2653374, at *3 (N.D. Cal. July 6, 2011) ("[A]n insurer cannot 'stack' SIRs by requiring an insured to exhaust all SIRs in multiple policies that potentially provide coverage before being liable under its own policy."); *Cal. Pac. Homes, Inc. v. Scottsdale Ins. Co.*, 70 Cal. App. 4th 1187, 1194 (1999) (rejecting insurer's argument that five retained limits should be applied to a single occurrence causing damage in the policy periods of five successive policies); *see also PECO Energy Co. v. Boden*, 64 F.3d 852 (3d Cir. 1995) ("[I]t would be inconsistent to break a single occurrence into multiple occurrences for the purpose of applying a deductible. The dissent, however, would aggregate six deductibles and arrive at a total of $520,000 for a single occurrence. The parties never contracted for such a result."). National Union contends the principle of "horizontal exhaustion" should apply to retained limits, rather than to primary insurance policies. But courts recognize that is not the case. *State of Cal. v. Continental Ins. Co.*, 15 Cal. App. 5th 1017, 1031, 1035-36 (2017).

Having cited no policy language or authority saying the Church must satisfy a separate retained limit under each triggered policy before it can recover against National Union, National Union's argument must be rejected.  The Court should find the Church need only satisfy a single retained limit for the single occurrence for which it seeks recovery in this case.

**3.    Pro-Rata Allocation of the Retained Limit Is Proper When an Occurrence Triggers More than One Policy.**

Pro rata allocation of the retained limit is one way courts have applied retained limits in cases like this one, where a single occurrence triggers multiple policies.  Assume Victim A is

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 15

abused during Policy A and Victim B is abused during Policy B. C's negligence was the proximate cause of the abuse and was a single occurrence. C settles with Victim A for $17,500,000 and with Victim B for $7,500,000. Policy A and Policy B both have a $15 million retained limit "each occurrence." If Policy A and Policy B are issued by the same company, apportionment is unnecessary. The loss exceeds the retained limit by $10 million, which is what the insurer must pay. If Policy A and Policy B are issued by different companies, however, because 70% of the $25 million loss ($17,500,000) is for bodily injury during Policy A, 70% of the retained limit ($10,500,000) is apportioned to that policy, and Insurer A must pay $7 million of the $10 million over the retained limit. The other $4,500,000 of the retained limit is apportioned to Policy B, and Insurer B must pay $3,000,000. Thus, C still bears the cost of the $15 million "each occurrence" retained limit, while Insurer A and Insurer B both get the benefit of that retained limit.

As the Church's motion shows, this is the approach several courts have taken. In *PECO Energy Co. v. Boden*, the court rejected the insurer's argument that "a full deductible applies to each loss" and, alternatively, that "a full deductible applies to each policy year." 64 F.3d at 857. "We reject these arguments," the court held, "because it would be inconsistent to break a single occurrence into multiple occurrences for the purpose of applying a deductible." *Id*. National Union tries to distinguish *PECO* by saying it "involved an 'all risk' policy, not an occurrence-based policy." NU Opp. at 29 n.20. National Union does not explain why that distinction makes a difference, and it doesn't. The Church's motion cites cases from the Third, Fourth, Fifth, and Sixth Circuits applying this same approach. Church Mtn. at 27-38. The only contrary case National Union cites is *Olin Corp. v. Insurance Company of North America*, 221 F.3d 307 (2d Cir.

2000), which does what the Third Circuit refused to do in *PECO*—it "broke a single occurrence into multiple occurrences for purposes of applying the deductible." *PECO*, 64 F.3d at 857.

National Union argues that "the Church's prorating of the Retained Limit relies on damages that are not for Bodily Injury taking place during National Union's policy period." NU Opp. at 29. But nothing in the Policy prevents this. The Church seeks to recover only for those injuries suffered by P.C. during the Policy period—but it may use all the damages paid for "each occurrence" to satisfy the retained limit. National Union also argues that "[a]pplying a single Retained Limit across the National Union and ACE policies would . . . deprive National Union of most of the Retained Limit's value . . . by purporting to spread the Retained Limit to periods not covered by the National Union Umbrella Policy." *Id.* To the contrary, spreading the Retained Limit across policies triggered by the Occurrence is precisely what National Union bargained for. Again, the Retained Limit is ███████ *each occurrence*, not *each policy period*. When a single occurrence causes bodily injury in more than one policy period, the insurer does not get the benefit of a second retained limit.

Finally, National Union cites *Public Service Co. of Colo. v. Wallis & Companies*. But that case dealt with apportionment of *liability* across policy periods for a single loss. To the extent it addressed retained limits, it supports the Church because it said the insured had to "exhaust one SIR *per occurrence* . . . ." 986 P.2d 924, 931 (Colo. 1999) (emphasis added).

**E.      The Expected/Intended Exclusion Does Not Apply as a Matter of Law.**

The Policy excludes coverage when "the insured" expected or intended the injury. The Church argued that only the expectation or intent "of an official of the insured in a management position" matters for this purpose. *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 1994 WL

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 17

721786, *4 (Sup. Ct. Del. Apr. 22, 1994); *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 44 F. Supp. 2d 865, 866 (E.D. Mich. 1999); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1317 (5th Cir. 1982) (insured company "expected or intended" the damage because the "highest officers" and other "important personnel" were aware of the disposal of hazardous materials).

National Union does not dispute that only the intentions of high-ranking officers matters. But it asks the Court to decide, based on allegations, not evidence, that high-ranking Church officers were involved in the conduct alleged in the Underlying Lawsuit. National Union asserts the evidence adduced in the Underlying Lawsuit shows that Michael Jensen's mother, Sandralee Jensen, was a relief society president, and Steven Grow was a stake president. National Union asserts that these are "positions of significant authority within the Church." NU Opp. at 36. But National Union offers no *evidence* to show that these are high-ranking officials whose "expectation and intent is that of the corporate entity" itself. *Aetna*, 44 F. Supp. 2d at 866. To the contrary, the only evidence in the record on this point—the Declaration of Branden Wilson submitted by the Church [Dkt. 45]—establishes they are part-time local volunteers with no policymaking authority.

Moreover, National Union seems to concede that there is no evidence any of the individual defendants in the Underlying Lawsuit *subjectively* expected or intended Michael to sexually abuse the plaintiffs. Instead, National Union contends that there is also an "objective standard." NU Opp. at 34-35. But the cases National Union cites deal with whether there was an "accident" or "occurrence" under an insuring agreement, not an expected-or-intended exclusion. The former includes an objective component.[3] *See N.M. ex rel. Caleb v. Daniel E.*, 175 P.3d 566, 570 (Utah

---

[3] Note that National Union has never denied that this case involves an "occurrence," which is defined in its policy as "an accident." Thus, National Union has conceded that from the Church's

2008).   The latter does not.   The Policy says there is no coverage if the injury is expected or intended "from the standpoint of the insured."   "'From the standpoint of the Insured' creates a subjective standard."   *Allstate Ins. Co. v. Davis*, 831 F.2d 1063 (6th Cir. 1987).   Thus, "[t]he 'expected or intended' exception is inapplicable unless the insured specifically and subjectively intends the injury giving rise to the claim."   *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1297-98 (D. Utah 1994) (quotations omitted).   "This interpretation of the standard intentional-harm exclusion is consistent with that of commentators and cases nationwide."   *N. Sec. Ins. Co. Inc. v. Stanhope*, 14 A.3d 257, 263 (Vt. 2010) (citing cases).

In any case, "the burden thereof rests upon the insurer" to prove that an exclusion applies. *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 859 (Utah 1988) (quotations omitted).   And "[e]xclusion clauses are strictly construed against the insurer . . . ." *Id*. (quotations omitted).   "Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 944 (10th Cir. 2008) (cleaned up).   National Union says that "to date, there has been no discovery with respect to probative facts relative to the Expected or Intended exclusion's application, including . . . the extent of other Church officials' knowledge regarding the risks posed by holding Michael Jensen out as a safe person . . . ."   NU Opp. at 33.   But National Union has discovery from the Underlying Lawsuit, including more than 90 deposition transcripts and a complete trial transcript. There is no evidence anywhere in that extensive record that any senior Church leaders even knew

perspective, the bodily injury at issue was an "accident," both from a subjective and objective standard.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST NATIONAL UNION - 19

who Michael Jensen was.  Moreover, if National Union needs evidence to support its opposition, it must "show[ ] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition . . . ."  Fed. R. Civ. P. 56(d).  National Union has not done so.

## IV.   CONCLUSION

For all the foregoing reasons, the Church respectfully reiterates its request that the Court GRANT its instant motion.

DATED this 30th day of June 2023.

KIRTON MCCONKIE

 /s/ Haley K. Krug
Haley K. Krug
*Attorneys for Plaintiff, The Church of Jesus Christ of Latter-day Saints*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of June 2023, I caused a true and correct copy of the

foregoing document to be served via e-mail to the following persons:

| | |
|---|---|
| Amy P. Klie | aklie@nicolaidesllp.com |
| Rebecca L. Hill | rebecca.hill@chrisjen.com |
| Phillip S. Ferguson | phillip.ferguson@chrisjen.com |
| Christopher A. Wadley | cwadley@wwmlawyers.com |
| Ryan J. Rodman | rrodman@wwmlawyers.com |
| Michael F. Skolnick | mfskolnick@kippandchristian.com |
| Elizabeth Barton Bacon | lbacon@kippandchristian.com |

 /s/ Haley K. Krug
*Attorneys for Plaintiff, The Church of Jesus Christ of Latter-day Saints*