IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; and ACE PROPERTY AND CASUALTY INSURANCE CO.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00582-TC-CMR<br><br>District Judge Tena Campbell<br>Magistrate Judge Cecilia M. Romero |

The Plaintiff in this action, The Church of Jesus Christ of Latter-day Saints (the Church), maintains that Defendants National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union) and ACE Property and Casualty Insurance Company (ACE) were obligated to defend and indemnify the Church for certain losses stemming from a separate lawsuit involving sexual abuse by a Church member that resulted in a large settlement between the Church and several different children and their families. The Church has asserted claims for breach of contract and breach of the implied covenant of good faith and fair dealing, as well as a request for declaratory judgment under 28 U.S.C. § 2201.

Before the court are cross motions for summary judgment. (ECF Nos. 42–43, 47, 50.) The Church has moved for summary judgment on its claim for declaratory judgment against both National Union and ACE, and the Defendants have moved for summary judgment on all claims the Church asserts against them. For the reasons stated below, the court denies the Church's motions and grants the Defendants' motions.

# BACKGROUND

The parties dispute the extent to which the Defendants must defend and indemnify the Church for a settlement that the Church paid to victims who were sexually abused by Church member Michael Jensen between 2007 and 2012. During that period, the Defendants insured the Church under successive commercial umbrella liability policies. National Union insured the Church under a policy in effect from June 15, 2006, to June 15, 2007. (National Union Policy,[1] ECF No. 56-2 at 2.)[2] ACE issued six policies to the Church—each lasting about a year[3]—from June 15, 2007, to April 1, 2013. (ACE 2007 Policy, ECF No. 56-3; ACE 2008 Policy, ECF No. 56-4; ACE 2009 Policy, ECF No. 56-5; ACE 2010 Policy, ECF No. 56-6; ACE 2011 Policy, ECF No. 56-7; ACE 2012 Policy, ECF No. 56-8.) The Church seeks coverage under National Union's 2006 policy and ACE's 2007 through 2011 policies.[4]

## I. Underlying Litigation

On September 16, 2013, 12 minors and their parents sued the Church in West Virginia state court. (W. Va. Compl., Ex. 1 to Decl. Haley Krug, ECF No. 44-1 at ¶¶ 10–33.) The

---

[1] National Union is a subsidiary of AIG. See AIG Legal Notice, http://www.aig.com/legal-notice (last visited Mar. 27, 2025).

[2] Record citations are to exhibit PDF pages rather than internal document pages. Redacted versions of the relevant insurance policies are publicly available as attachments to the Church's redacted motions for summary judgment. (See Pl.'s Mot. Summ. J. against Nat'l Union, ECF No. 42; Pl.'s Mot. Summ. J. against ACE, ECF No. 43.)

[3] The ACE 2007 Policy was in effect from June 15, 2007, to June 15, 2008. (ECF No. 56-3 at 2.) The ACE 2008 Policy was in effect from June 15, 2008, to April 1, 2009. (ECF No. 56-4 at 2.) The remaining polices were in effect from April 1 of the policy year to April 1 of the subsequent year. (ECF No. 56-5 at 2; ECF No. 56-6 at 2; ECF No. 56-7 at 2; ECF No. 56-8 at 2.)

[4] The Church is not seeking coverage under ACE's 2012 policy. (Pl.'s Mot. Summ. J. against ACE, ECF No. 56-1 at 16.) The 2012 policy, unlike the other ACE policies, clarified that the retained limit for coverage of sexual abuse and molestation claims was "█████████ each claimant." (ACE 2012 Policy, ECF No. 56-8 at 54, 62 (emphasis added).) The court discusses this clarification in more detail below.

plaintiffs also sued Michael Jensen, who was in his teens and early twenties when the abuse occurred; Donald Fishel, the Bishop of the Hedgesville Ward of the Martinsburg, West Virginia Stake;[5] Steven Grow, the Martinsburg Stake President; Christopher Jensen, a Church High Priest, High Council Member of the Martinsburg Stake, and Michael Jensen's father; and Sandra Lee Jensen, the Martinsburg Stake Relief Society President and Michael Jensen's mother.  (Id. ¶¶ 34–42.)  Another minor plaintiff and additional causes of action against Michael Jensen were added to the litigation in February 2014.  (W. Va. Am. Compl., Ex. 2 to Krug Decl., ECF No. 44-2 at ¶¶ 36, 216–22, 229–34.)

The plaintiffs in the West Virginia case alleged that the defendants were negligent for failing to warn Church families about Michael Jensen's history of child sexual abuse, holding out Mr. Jensen's babysitting services for Church families, coordinating Mr. Jensen's living arrangements with Church families with minor children, failing to report a reasonable suspicion of child sexual abuse, failing to properly supervise and train Church agents, and failing to protect the minor plaintiffs from harm.  (Id. ¶¶ 122–82.)  The plaintiffs alleged that the Church received several warnings about Michael Jensen's sexual abuse of minors during the relevant period.  (Id. ¶¶ 78, 82–85, 89, 92–99, 106–07, 116.)  About two months before the plaintiffs filed the West Virginia lawsuit, a judge sentenced Mr. Jensen to 35–75 years in state prison, followed by

---

[5] "At the local level, the Church is divided into 'wards' and 'stakes.'  A 'ward' is a congregation of 200 to 500 members.  There are around 31,000 wards in the Church.  A 'stake' consists of 5 to 12 wards.  There are roughly 3,500 stakes in the Church."  (Decl. Branden Wilson, ECF No. 45 at ¶ 4.)  Council members, relief society leaders, high priests, "[s]take presidents and bishops have no policy-making authority for the Church.…  They are part-time local volunteers. The Church has no paid clergy at the local level."  (Id.)

50 years of probation, and ordered him to register as a sex offender.[6] (Id. ¶ 120.) He is currently serving that sentence.[7]

In 2018, the parties to the underlying litigation reached a settlement agreement. (Email from Paul Rytting to David Humphreys, et al., Apr. 2, 2018, Ex. 18 to Decl. Amy Klie, ECF No. 54-16.) The Church compensated nine of the minor plaintiffs and their parents.[8] (Id.) The settlement amounts for the plaintiffs ranged from ███████ to ████████. (Id.) In total, the Church paid ██████ to settle the plaintiffs' claims. (Id.) At a hearing on the motions for summary judgment, counsel for the Church informed the court that the case represented the largest settlement ever paid by the Church to sexual abuse victims and that the loss was catastrophic for the Church.

But the minor plaintiffs and their families also suffered devastating losses from Mr. Jensen's abuse. From 2006 to 2007, while National Union's policy was in effect, Mr. Jensen babysat and abused P.C. (W. Va. Am. Compl. ¶¶ 79–81.) P.C. received a settlement of ██████, and her parents received ██████. (ECF No. 54-16.) In November 2007, while ACE's 2007 policy was in effect, Mr. Jensen babysat and abused siblings J.T. and W.T. (W. Va. Am. Compl. ¶ 87.) J.T. and W.T. each received settlements of ███████, while their parents received ██████. (ECF No. 54-16.) From March to April 2008, also during the time the Church was covered by ACE's 2007 policy, Mr. Jensen babysat and abused Z.W. and forced

---

[6] On October 18, 2022, authorities had charged Mr. Jensen with two counts of first-degree sexual assault and two counts of first-degree sexual abuse by a custodian. (W. Va. Am. Compl. ¶ 118.) A jury found him guilty on three of the four courts. (Id. ¶ 119.)

[7] See WV Division of Corrections & Rehabilitation Offender Search, https://dcr.wv.gov/offendersearch/Pages/default.aspx (last visited Mar. 27, 2025).

[8] The other minor plaintiffs voluntarily dismissed their claims before the parties settled. (See W. Va. Dkt., Ex. 4 to Krug Decl., ECF Nos. 44-4 & 57-1.)

Z.W.'s brother, A.W., who has special needs, to watch.  (W. Va. Am. Compl. ¶¶ 90–91.)  Z.W.

received ███████ as compensation, A.W. received ███████, and their mother received

███████.  (ECF No. 54-16.)  In February 2009, while ACE's 2008 policy was in effect, Mr.

Jensen abused C.H.  (W. Va. Am. Compl. ¶ 101.)  C.H. settled for ███████, and her parents

settled for ███████.  (ECF No. 54-16.)  Finally, Mr. Jensen abused A.B. and her three siblings

between April 2010 and "the middle of 2011[.]"  (W. Va. Am. Compl. ¶¶ 102–03.)  A.B.

received ███████ and the Church settled with A.B.'s parents for ███████.  (ECF No. 54-16.)

## II. Relevant Policy Language

National Union's policy requires it to pay on the Church's behalf "th[e] sums in excess of

the Retained Limit that the [Church] becomes legally obligated to pay as damages by reason of

liability imposed by law because of Bodily Injury … to which this insurance applies …."  (ECF

No. 56-2 at 4.)  The Retained Limit for National Union's general liability coverage is

"███████ EACH OCCURRENCE[.]"  (Id. at 79.)  Although similar to a deductible, National

Union points out that a retained limit does not obligate an insurer to undertake an insured's

defense until after the insured has satisfied the retained limit.  (Nat'l Union Mem. Opp'n, ECF

No. 70 at 15–16.)

National Union's policy has other limits to coverage.  "Th[e] policy applies, only if:

1. the Bodily Injury … is caused by an Occurrence that takes place anywhere, and the Bodily

Injury … occurs during the Policy Period[.]"  (ECF No. 56-2 at 4.)  "Bodily injury" is defined as

"bodily injury, sickness or disease sustained by any person, including death, mental anguish,

mental injury, shock or humiliation resulting from any of these at any time."  (Id. at 33.)  The

policy defines "occurrence" as "an accident, including continuous or repeated exposure to

5

substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one Occurrence."  (Id. at 23.)

Similarly, ACE's policies obligate it to pay on the Church's behalf "sums in excess of the 'retained limit' that the [Church] becomes legally obligated to pay as damages because of 'bodily injury' … to which this insurance applies."  (ECF No. 56-3 at 5.)[9]  The "retained limit" applicable to the ACE policies' commercial general liability coverage is ██████ for "Each Occurrence[.]"  (Id. at 30.)

ACE's coverage only applies to "bodily injury" that "is caused by an 'occurrence'" and "occurs during the 'policy period[,]'" and when, "[p]rior to the 'policy period', no 'insured' and no 'employee' authorized by [the insured] to give or receive notice of an 'occurrence' or claim, knew that the 'bodily injury' … had occurred, in whole or in part."  (Id. at 5.)  "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.  'Bodily injury' includes mental anguish or mental injury resulting from bodily injury."  (Id. at 19.)  "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof, or the number of claimants."  (Id. at 21.)

The Church and the insurers dispute how to interpret the term "occurrence" as it is used in the policies.  This dispute affects whether the Church exhausted the policies' applicable

---

[9] The policy language included in this section, from ACE's 2007 policy, is not meaningfully different from the language in ACE's 2008 to 2011 policies.

retained limits and, as a result, whether the insurers were obligated to provide general liability coverage under any policy at issue.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the case. See Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Once the movant shows there is an "absence of a genuine [dispute] as to any material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (citation omitted).

"The construction of an insurance contract is a matter of law that the court can resolve in the context of a motion for summary judgment." Hartford. Acc. & Indem. Corp. v. U.S. Fidelity & Guar. Co., 765 F. Supp. 677, 679 (D. Utah 1991) (citing Adams-Arapahoe Joint Sch. Dist. v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)). Construction of an insurance contract remains a question of law even where parties disagree about what the contract means. Id. (citing Gomez v. Am. Elec. Power Serv. Corp., 762 F.2d 649, 651–52 (10th Cir. 1984)).

The parties agree that Utah substantive law governs this case. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78–79 (1938) (holding that when cases come before federal courts through diversity jurisdiction, federal courts apply the substantive law of the state where they

sit).  But "[i]f the state's highest court has not addressed the issue presented, the federal court

must determine what decision the state court would make if faced with the same facts and issue."

Armijo v. Ex. Cam, Inc., 843 F.2d 406, 407 (10th Cir. 1988) (noting that to predict what a state's

highest court would do, federal courts should consider "state court decisions, decisions of other

states, federal decisions, and the general weight and trend of authority").

        Because an insurance policy is a contract, the court will "first look at the plain language

of the contract to determine the parties' meaning and intent."  Brady v. Park, 445 P.3d 395, 407

(Utah 2019) (cleaned up).  If the contract's language is unambiguous, "the parties' intentions are

determined from the plain meaning of the contractual language, and the contract may be

interpreted as a matter of law."  Id. (citation omitted).  Ambiguities in insurance contracts should

be construed in favor of coverage.  See U.S. Fidelity & Guar. Co. v. Sandt, 854 P.2d 519, 521

(Utah 1993) ("Since 1921 this Court has expressed its commitment to the principle that

'insurance policies should be construed liberally in favor of the insured and their beneficiaries so

as to promote and not defeat the purposes of insurance.'" (citations omitted)).

## ANALYSIS

### I. Duty to Indemnify

        The court first analyzes whether the insurers had a duty to indemnify the Church for any

portion of the settlement it paid to the victims of Mr. Jensen's abuse.  Because the relevant

policies require the Church to exhaust its ▮▮▮▮▮ retained limit for "each occurrence" that

arises under the policy, the court must determine how many "occurrences" arose from the

underlying facts of each child's abuse.  The more occurrences, the more retained limits the

Church must exhaust, and the greater the loss the Church must bear out of pocket before

insurance coverage begins.  The Utah Supreme Court has not considered how to interpret the

8

word "occurrence" in an insurance policy in any context, let alone in a case involving sexual abuse.[10]  Accordingly, the court must predict how the Utah Supreme Court would answer this question if faced with similar facts.

### A. The Parties' Positions

The Church argues that there is only one occurrence at issue here—namely, the Church's negligence, which lasted several years, and for which the Church paid a settlement of ██████████ to a number of children and their families.[11]  (Pl.'s Mot. Summ. J. against Nat'l Union, ECF No. 56 at 23–26.)  The Church also contends that the insurance policies permit the Church to satisfy "a single retained limit [that] applies across [all] policies."  (Id. at 33–34.)  The Church maintains that because the overall settlement was in excess of the ████████ retained limit, the Defendants are required to indemnify the Church for a portion of this excess amount (████████).[12]

To determine the amount owed to the Church under each policy, the Church argues that the court should apportion the ████████ retained limit across the policies—even when those policies were issued by different insurers—based on the amount of loss that occurred during each period.  (See id. at 33–35 ("[W]hen you have a single retained limit per occurrence, but the

---

[10] Although Utah courts have considered closely related questions in the insurance context, the court finds that these cases are all distinct and therefore do not answer the question about how many occurrences arose from the facts presented here.  See, e.g., N.M. ex rel. Caleb v. Daniel E., 175 P.3d 566 (Utah 2008) (interpreting the meaning of "accident" in an insurance policy); Taylor v. Am. Fire & Cas. Co., 925 P.2d 1279 (Utah Ct. App. 1996) (interpreting a coverage exclusion for incidents involving motor vehicles).

[11] The total "loss" to the Church in this case was ████████, the value of the settlement.  (ECF No. 51-18.)  "Loss means those sums actually paid as judgments or settlements[.]"  (ECF No. 56-2 at 64.)

[12] As noted above, see supra note 4, the Church is not seeking coverage under ACE's 2012 policy, so it is only seeking a portion of the total excess amount.

occurrence spreads across and triggers multiple policies, the … retained limit can be allocated to each triggered policy based on the amount of loss that occurred during that policy period.").)

The Church relies on PECO Energy Co. v. Boden, 64 F.3d 852, 854 (3d Cir. 1995) and similar cases. (ECF No. 42 at 26–28.) In PECO Energy, the plaintiff was an electric utility company (PECO) who discovered that a trucking company had been stealing a portion of the utility's oil from 1984 to 1990, during which time PECO was covered by a succession of one-year insurance policies providing that $100,000 "shall be deducted from the amount of each loss or combination of losses arising out of any one occurrence …." Id. at 854–55. The Third Circuit agreed with the district court's finding that "the multitude of thefts over the six-year period constituted a single occurrence."[13] Id. at 855–56. But the Third Circuit overturned the district court's decision placing the total liability for PECO's losses on the underwriters for the policy covering the year in which PECO discovered the thefts, finding that "the policies in this case are 'all risks' policies, not 'occurrence' policies, and provided coverage for all losses which took place during the policy period." Id. at 856. Based on this finding, the Third Circuit calculated the utility's recovery under each one-year policy by determining the loss that PECO sustained during that period, calculating that loss as a percentage of the total insured loss, applying that percentage to the deductible, and subtracting that number from the loss for that period. See id. at 857.

---

[13] Notably, the jury in the district court case found that PECO did not discover the theft until six years after the theft began. See PECO Energy, 64 F.3d at 856. Accordingly, the Third Circuit characterized the larger scheme as "the proximate and continuing cause of a series or combinations of thefts …." Id. As the court discusses below, the Church received several warnings about Mr. Jensen's actions and cannot claim that it was similarly unaware of the underlying abuse.

Following this approach, the Church calculates the following recoveries for each year in which a child or multiple children were abused:

| Policy | Plaintiffs | Indemnity Payment | Insurer | Percentage of Total Loss | Amount of Retained Limit Based on Percentage of Total Loss | Recovery |
|---|---|---|---|---|---|---|
| 2006 | P.C. P.C. Parents | | AIG | | | |
| 2007 | J.T. W.T. T. Parents Z.W. A.W. W. Parents | | ACE | | | |
| 2008 | C.H. C.H. Parents | | ACE | | | |
| 2011[14] | A.B. A.B. Parents | | ACE | | | |
| 2012 | M.S. T.S. S. Parents | | ACE | | | |

(ECF No. 56 at 35–36.)  The Church asks the court to declare that the insurers had a duty to indemnify and defend the Church for its legal costs in the underlying lawsuit according to the recovery amounts listed above.  (Id.)  Finally, the Church argues that none of the insurers' coverage exclusions (Exclusions I, U, and K) bar recovery in this case.  (Id. at 30–38.)

The position taken by National Union and ACE is much simpler.  The insurers argue that Mr. Jensen's abuse of each minor plaintiff between 2007 and 2012 was a separate occurrence.

---

[14] The court believes the Church meant to list ACE's 2010 policy in this box, as the Church elsewhere states that A.B. was abused while ACE's 2010 policy was in effect.  (See, e.g., ECF No. 43 at 16, 33.)

[15] The Church does not seek to recover this amount because, as discussed further below, it agrees that ACE's 2012 policy does not cover any portion of the settlement.

(Nat'l Union Mot. Summ. J., ECF No. 50; ACE Mot. Summ. J., ECF No. 47.)  And because the Church did not settle the claims of any minor plaintiff for more than ████████, the insurers maintain that the Church failed to exhaust the policies' applicable retained limits and is therefore not entitled to coverage or indemnification for the costs of the underlying suit, mooting any arguments about the application of certain policy exclusions—which, in any event, the insurers maintain also operate to preclude coverage.  (Id.)

### B.  Relevant Policy Language

Turning first to the policy language, both insurers' policies require the exhaustion of a retained limit for "each occurrence."  National Union's policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general harmful conditions will be deemed to arise out of one occurrence."  (ECF No. 56-2 at 23.)  ACE's policy similarly defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  All such exposure to substantially the same general conditions shall be considered as arising out of the same 'occurrence', regardless of the frequency or repetition thereof, or the number of claimants."  (ECF No. 56-3 at 21.)

The Church argues that the abuse suffered by Mr. Jensen's victims arose out of the same general harmful conditions—namely, the Church's negligence.  The Church points to the language in ACE's policy especially, which highlights that multiple claimants may be exposed to the conditions arising out of one occurrence, "regardless of the frequency or repetition" of those conditions.

The court finds that the Church's interpretation of the policy language reaches too broadly, because it disregards how the Church's negligence evolved over time.  It is undisputed

12

that Church leaders received multiple warnings about Mr. Jensen's sexual misconduct.  There is evidence that at least some of the underlying defendants knew as early as 2004 or 2005 that Mr. Jensen sexually abused minor children, well before P.C. was abused in April 2007.  (W. Va. Appellants' Brief, Ex. B to ACE Resp., ECF No. 64-1 at 11 n.3 ("Michael, at age 18, was caught on top of his younger sister K.J., then 12, on her bed").)  And after P.C.'s 2007 abuse, "Church officials were on notice that Michael Jensen had at least abused his younger sister and had done something bad to P.C. that had, in the words of Stake High Councilor Jensen, 'scarred her for life.'"  (W. Va. Am. Compl. ¶ 83.)  "By 2007, at the latest, the Martinsburg Stake High Council met to discuss various matters, including Michael Jensen's abuse of his younger sibling … and possible abuse of another minor child who was also a member of the Church's Martinsburg Stake."  (Id. ¶ 83.)  "[Around] this same time, because of the severity of the situation concerning the alleged abuse, Stake President Grow discussed the situation with [other Stake leaders.]"  (Id. ¶ 84.)

Between 2007 and 2011—the relevant time period for this case—, Church officials had multiple opportunities to intervene and prevent some, if not all, of the abuse.  (See id. ¶¶ 93–97, 100–01 (alleging that after brothers Z.W. and A.W. were abused, their parents contacted Bishop Fishel, who defended Mr. Jensen and took no action to prevent Sandralee Jensen from continuing to offer her son's babysitting services); see also id. ¶¶ 86, 90, 101 (explaining how Mrs. Jensen continued to hold out Mr. Jensen's babysitting services and Church officials did nothing).)  The number of warnings the Church received about Mr. Jensen throughout the relevant period suggests that the Church's inaction became more egregious over time as the allegations increased in frequency.  As a result, the Church's negligence did not amount to "the same general harmful

conditions" (ECF No. 56-2 at 23) or "the same general conditions" (ECF No. 56-3 at 21) because it was not one uninterrupted, proximate, and continuing cause of the victims' abuse.

The court therefore declines to adopt the Church's argument that its negligence was one occurrence. Instead, the court finds that a separate occurrence arose every time Mr. Jensen abused separate children at separate times and in separate places. This interpretation of "occurrence" more accurately reflects the source of the Church's loss under the policies. Although the court agrees with the Church that its negligence was the source of that loss, an admission or finding that the Church was negligent towards one child is not an admission or finding that the Church was negligent towards other children—the facts establishing the Church's negligence are specific to each child.

For this reason, an insured who negligently supervises a person who commits multiple acts of sexual abuse is distinct from an insured who negligently causes a hazardous waste spill or prepares contaminated food, thereby injuring multiple victims. In Republic Underwriters Insurance Co. v. Moore, for example, a restaurant prepared and served food that was contaminated with E. coli, infecting 341 people, and killing one. 493 F. App'x 907, 908 (10th Cir. 2012). The Tenth Circuit held that the "ongoing preparation of contaminated food"—even though the food was served in multiple locations and injured hundreds of people—constituted one occurrence. Id. at 913. But in Moore, the insured's negligence was more clearly "one proximate, uninterrupted, and continuing cause" of the victims' injuries. Id. at 911–12 (emphasis added). The contamination originated from one place—the restaurant—and occurred during an 11-day period. See id. at 908–12. There does not appear to have been an opportunity for the restaurant to intervene between when the first victims and last victims fell ill.

14

By contrast, the children in this case were injured over several years, in different locations, and under different circumstances. The facts that establish whether the Church's negligence was a cause of each child's abuse are unique to each individual. Under the Church's interpretation of "occurrence," Mr. Jensen is akin to a bad driver whom the Church negligently hired and who injured multiple people in a single crash. But Mr. Jensen's yearslong pattern of abuse of multiple children—and the warnings the Church received about that abuse—is more analogous to a bad driver who was negligently allowed back on the road over and over, despite repeated accidents.

Based on the policy's definition of "occurrence," the court therefore predicts that the Utah Supreme Court would adopt a rule that the abuse of separate victims at separate times and in separate places presumptively constitutes multiple occurrences. But that rule does not answer every question posed by these facts, or by similar facts in other cases. For instance, the rule does not explain when the presumption may be overcome, nor does it dictate how many occurrences arose when Mr. Jensen abused multiple victims at the same time, or when he abused one victim several times over an extended period. To decide these questions, the court first reviews other court decisions that have considered similar issues.

### C. Relevant Caselaw

Several courts have addressed whether a church's negligence "constitute[s] multiple occurrences" when that negligence permits multiple acts of sexual abuse, sometimes spanning years.[16] Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 991 N.E.2d 666, 671 (N.Y. 2013) (holding that abuse of different victims at different times

---

[16] Unless otherwise specified, the cases discussed in this section concern policies in which the definition of "occurrence" does not differ meaningfully from the way that term is defined in the National Union and ACE policies.

constituted separate occurrences after employing an "unfortunate event test" requiring "consideration of whether there is a close temporal and spatial relationship between the incidents … and whether the incidents can be viewed as part of the same causal continuum without intervening agents or factors). The majority of courts agree with this court's finding that when there are multiple victims, especially when those victims are abused at different times and places, the abuse of those victims presumptively constitutes multiple occurrences within the meaning of the relevant policy.

In Worcester Insurance Co. v. Fells Acres Day School, Inc., for instance, the Supreme Judicial Court of Massachusetts (SJC) rejected the argument made by Worcester Insurance Co. (Worcester) that the molestation of numerous children by multiple insureds constituted a single occurrence. 558 N.E.2d 958, 973 (Mass. 1990). Worcester supported its argument by relying on cases holding "that in circumstances where many corporate employees suffered from a discriminatory corporate employment policy, there was but one 'occurrence': the adoption of a discriminatory policy." Id. (citing Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982), and Transport Ins. Co. v. Lee Way Motor Freight, 487 F. Supp. 1325, 1330 (N.D. Tex. 1980)). The SJC held that the facts before the court were "fundamentally different" from cases involving a single, problematic policy. Id. The court further noted that it had previously rejected attempts to "characterize seemingly discrete events as emanating from a single, ongoing cause" and found that, where the plaintiffs in the underlying litigation "allege[d] numerous discrete acts of abuse, negligence, and breach of duty by several different defendants, some individual and one corporate, at different locations[,] … the possibility that there was but a 'single, ongoing cause' of the injuries alleged" was foreclosed. Id.

The Fifth, Ninth, and Seventh Circuits have issued similar rulings.  In H.E. Butt Grocery Co. v. National Union Fire Insurance Co. of Pittsburgh, the Fifth Circuit held that "two independent molestations of two children equal[ed] two occurrences."  150 F.3d 526, 532 (5th Cir. 1998).  After an H.E. Butt Grocery Co. (HEB) employee sexually assaulted two different children a week apart in a store bathroom, the families of the two children sued the store in separate lawsuits, alleging that "HEB knew that the same employee had committed an act of 'untoward sexual conduct' in the past with a different child at another store and that the sole corrective action taken was to transfer the employee to another store location."  Id. at 528.  In a subsequent lawsuit against its insurer, HEB argued that it had satisfied its self-insured retention limit of "$1,000,000 per 'occurrence'" because HEB had settled the two lawsuits for $1,000,000 each and because both incidents of abuse arose "out of … substantially the same general conditions" and were therefore one occurrence: HEB's negligent oversight of its employee.  Id. at 528–29.

The Fifth Circuit disagreed, finding that "it was clear that each child's injuries [were] independent and caused by the separate acts of sexual abuse."  Id. at 534.  The court therefore found that "two independent acts of sexual abuse injuring two children are two occurrences."  Id. at 535.[17]  The Fifth Circuit also discussed its previous ruling in Society of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co., 26 F.3d 1359, 1365 (5th Cir. 1994) (Catholic Church).  In Catholic Church, the Fifth Circuit considered two separate questions: 1) how the definition of "occurrence" applied to the molestation of multiple

---

[17] Although all members of the panel agreed with the outcome, two judges concurred, with one judge writing separately to express his disagreement with the framework used by his colleague. See id. at 535 (Wiener, J., concurring in the judgment only), 535–38 (Benavides, J., concurring). The court discusses this disagreement below, see infra § I.D.

victims; and 2) "whether multiple acts of sexual abuse on <u>the same child</u> constituted one or

multiple occurrences." <u>Id.</u> at 1364–66.  The Fifth Circuit held that the molestation of separate

children amounted to multiple occurrences, whereas the repeated molestation of one child

resulted in one occurrence per policy period.  <u>Id.</u>  In <u>H.E. Butt Grocery</u>, the Fifth Circuit

summarized this holding as follows:

> As the opinion in <u>Catholic Church</u> itself makes clear, the conclusion that multiple
> molestations of the same child is only one occurrence is easily distinguishable
> from the conclusion regarding separate acts of molestation of different children.
> Where an employee repeatedly molests the same child, each new act of abuse
> does not necessarily give rise to new liability for the employer.  In the case at
> hand, however, HEB is exposed to new liability for each separate and independent
> act of molestation on a new child.

150 F.3d at 533.  The Fifth Circuit reached this conclusion even though it made no mention of

whether HEB was aware of the first assault before the second act of abuse occurred.  <u>See</u> <u>id.</u>

at 528.

     The Ninth Circuit decided a case involving the Archdiocese of Portland, who received

multiple reports over several years that one of its priests, Father Laughlin, was sexually

molesting minors.  <u>Interstate Fire & Cas. Co. v. Archdiocese of Portland</u>, 35 F.3d 1325, 1327

(9th Cir. 1994).  The dispute concerned the proper allocation of coverage between the

Archdiocese, its primary insurer, and its excess insurer, for the settlement of a lawsuit between

the Archdiocese and one of the victims of Father Laughlin's abuse.  <u>Id.</u>  Although the district

court held that Father Laughlin's molestations of the plaintiff constituted one occurrence under

the meaning of the policy, the Ninth Circuit reversed.  <u>Id.</u> at 1328–29.  The Ninth Circuit relied

in part on policy language defining "occurrence" as "an accident … during the policy period"—a

limitation that is not included in the National Union and ACE policies at issue in this case.  <u>Id.</u>

18

But the ruling also relied in part on other language in the definition of "occurrence" that is similar to the definition of "occurrence" in the policies here:

> [T]he terms of the policy make clear that negligent supervision alone, whether ongoing or not, would not trigger any obligation on the part of the insurers. Rather, it is the repeated "exposure" of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification. Although the final sentence of the definition of "occurrence" speaks broadly of "general conditions existing at or emanating from one location," the definition twice states unambiguously that it is "exposure" to such conditions, rather than the conditions themselves, that constitutes the occurrence.

Id. at 1329.  In other words, the Ninth Circuit considered both the immediate cause of the abuse (the child's exposure to the abuser), as well as the Archdiocese's negligent supervision that allowed that abuse to occur.

Finally, the Seventh Circuit considered the proper allocation of a sexual abuse settlement between the Roman Catholic Diocese of Providence, Rhode Island, its primary insurer (Lloyd's), and its excess insurer (Interstate).  Lee v. Interstate Fire & Cas. Co., 86 F.3d 101, 102 (7th Cir. 1996).  The underlying lawsuit concerned a priest, William O'Connell, who sexually abused a boy in two distinct places during two different years in which the Diocese had insurance policies. Id.  The Seventh Circuit criticized the argument made by Lloyd's that the victim suffered "'a continuous or repeated exposure to conditions'—that is, to O'Connell's proclivities—and that repeated exposure to substantially the same general conditions' can only be one 'occurrence.'" Id. at 103.  The Seventh Circuit further noted that it would be inappropriate to import concepts about "cause" from tort law to a case in which the tort was the negligent supervision of an intentional wrongdoer:

> "[C]ontinuous or repeated exposure to conditions" sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys.  A priest is not a "condition" but a sentient being, and of course the victim was never "exposed" to the Diocese's negligent supervision.

Id. at 104. The court suggested that Lloyd's "depict[ed] a pedophilic priest as similar to hazardous waste: living next to a church from which oil has seeped into the ground is one 'occurrence' no matter how long the conditions exist." Id. at 103.

But the Seventh Circuit found that Rhode Island courts would not be inclined to adopt an all-or-nothing rule in which a church's negligent supervision must be either one unitary act of negligence constituting one occurrence or multiple discrete acts constituting "one 'occurrence' per priest, per abused child, per policy year." Id. at 102, 104. Instead, the Seventh Circuit found that a decision on this question required a careful analysis of the facts at issue. See id. at 104–05. The court distinguished between an employer accused of negligent hiring, which "occurs only once per employee-employer pair[,]" and negligent supervision:

> If … a diocese receives multiple warnings about a priest's misconduct and ignores all of them, it would be appropriate to call those lapses multiple occurrences—for intervention after any one of them could have avoided some of the injury. But if instead the diocese receives no danger signals, and its negligence lies in failure to investigate on its own (if that is negligence at all), or if the diocese intervenes but takes action that in retrospect is inadequate, then the lapse looks more like a single occurrence under the policy's definition.

Id. The court therefore held that Rhode Island courts would not treat negligent supervision as "invariably one 'occurrence[.]'" Id. at 105.

This court agrees with the nuanced, fact-specific approach adopted by the Seventh Circuit. The rule that the court has derived from the policies' definition of "occurrence" is that the abuse of separate victims at separate times and separate places presumptively constitutes multiple occurrences. But this presumption can be overcome where the overarching negligence is more akin to negligent hiring. Here, where the Church received multiple warnings about the danger posed by Mr. Jensen, that presumption is not overcome.

The facts in <u>Lee v. Insterstate Fire & Casualty Co.</u> involved the repeated abuse of a single victim. <u>Id.</u> at 102.  These scenarios are especially challenging because the difference between one and multiple occurrences for the purposes of an insurance policy hinges on a number of factual questions once the abuse of a single victim has been set in motion: "Did the Diocese receive warnings?  How many, and when?  Should the Bishop have been suspicious in the absence of warnings?"  <u>Id.</u> at 105.  And if a court finds that the abuse constituted multiple occurrences, the court must then determine how to apportion the settlement received by a victim across the period when the victim suffered that abuse.

Perhaps to simplify these questions, some courts have held that a "child suffered an 'occurrence' <u>in each policy period</u> in which he was molested."  <u>Catholic Church</u>, 26 F.3d at 1365 (emphasis added); <u>see also</u> <u>Archdiocese of Portland</u>, 35 F.3d at 1327 (finding that where a plaintiff was abused over multiple policy periods, "there [was a] distinct loss in each policy period" and therefore a distinct occurrence).  But these cases are of limited value because, as the court noted above in its discussion of <u>Archdiocese of Portland</u>, the relevant policies specify that an "occurrence" is an accident that must take place during the policy period.[18]  <u>See</u> <u>Catholic Church</u>, 26 F.3d at 1362; <u>Archdiocese of Portland</u>, 35 F.3d at 1329.

Where such language is not present, the court finds that the appropriate approach when a victim has suffered repeated episodes of abuse over a period that spans successive insurance policies is to follow the Seventh Circuit's guidance in <u>Lee v. Interstate Fire & Casualty Co.</u> and examine the facts of the underlying abuse to determine whether the insured's actions were more akin to negligent hiring or negligent supervision.  Relevant factors the court should consider

---

[18] The requirement that an accident must take place during the policy period is not included in the policies here.  Instead, both the National Union and ACE policies specify that it is the "bodily injury" which must occur during the policy period.  (<u>See</u> ECF No. 56-2 at 4; ECF No. 56-3 at 5.)

include whether the episodes of abuse were closely related in time and location, as well as whether the insured had any warnings about the danger or the ability to prevent later abusive acts. But the court need not fully delineate an appropriate test for when a single victim has suffered repeat episodes of abuse because none of the victims who were abused by Mr. Jensen on multiple occasions settled their claims against the Church for an amount that exceeds the Church's retained limit per occurrence under the policies. As a result, even if the court held that only one act of negligence led to the multiple instances of abuse suffered by, for instance, A.B.— the only child who was arguably abused during multiple policy periods[19]—, the Church would not have exhausted its retained limit in settling with A.B.

But the court's clarification of its view of a case involving a single victim suffering multiple instances of abuse is useful to illustrate why the court is not persuaded by the cases the Church cites to support its argument. The court first analyzes two state court cases that considered similar insurance coverage questions where the insured was found liable for negligently allowing children to be molested. Notably, while these cases contain reasoning arguably favorable to the Church's position in the context of a single victim who was abused multiple times, both courts nevertheless held that abuse suffered by <u>different</u> victims constituted multiple occurrences.

---

[19] The Church and ACE agree that Mr. Jensen abused A.B. while ACE's 2010 policy was in effect (<u>see</u> ECF No. 56-6 at 2 (listing effective dates as April 1, 2010, to April 1, 2011)). They also agree that no plaintiffs were injured under ACE's 2011 policy, in effect April 1, 2011, to April 1, 2012 (<u>see</u> ECF No. 56-7). But the underlying complaint alleges that Mr. Jensen abused A.B. from April 2010 <u>to the middle of 2011</u>. (W. Va. Am. Compl. ¶ 102 (emphasis added).) In April 2011 (exact date unknown), Mr. Jensen also went on vacation with A.B.'s family to South Carolina. (<u>Id.</u> ¶ 103.) The underlying complaint, then, suggests that Mr. Jensen's abuse of A.B. occurred during multiple policy periods.

First, the Church cites State Farm Fire & Casualty v. Elizabeth N. (ECF No. 56-1 at 29–30), in which the court held that "multiple instances of negligent care and supervision, which allowed several children to be repeatedly molested," constituted one occurrence per child. 9 Cal. App. 4th 1232, 1234 (Cal. Ct. App. 1992). There, "State Farm insured Lynn Lynn under a homeowner's policy that included coverage for personal liability to third parties." Id. For about four years, Ms. Lynn offered childcare services at her home, where she lived with her husband, Byron. Id. at 1234–35. Parents of some of those children sued the Lynns after they discovered that Mr. Lynn had sexually abused their children while under Ms. Lynn's care. Id. at 1235. The court held that "the multiple injuries suffered by each child resulted from repeated exposure to substantially the same general conditions" because "each act of negligence by [Ms.] Lynn was substantially the same[,]" even if Ms. Lynn's repeated failures to stop the abuse could be considered new negligent acts. Id. at 1238. That reasoning does not necessarily diverge from the framework the court adopts here, as there was a question of fact about whether Ms. Lynn, the insured, had "any knowledge of Byron's actions with the children." Id. at 1234. And importantly, the State Farm holding is consistent with the outcome the court reaches here, that "the insured's liability to each child was one occurrence." Id. at 1234 (emphasis added).[20]

Similarly, a Pennsylvania state court held that an insured's "failure to prevent … [sexual] abuse was a continuing negligence which constitute[d] only one occurrence under the policy language." Gen. Accidental Ins. Co. of Am. v. Allen, 708 A.2d 828, 835 (Pa. Super. Ct. 1998). In Allen, three children, through their mother and natural guardian, sued Eugene and Elizabeth

---

[20] During negotiations to conclude the lawsuit, the parties limited the remaining disputes by stipulation. Elizabeth N., 9 Cal. App. 4th at 1235. As a result, it appears that the court never considered arguments about whether multiple victims constituted multiple occurrences. The case therefore has limited applicability to the facts at issue here.

Allen, alleging that between 1986 and 1988 Mr. Allen sexually abused them in various ways. Id. at 829. The plaintiffs asserted negligence claims against Ms. Allen, arguing that she failed to prevent the abuse and allowed the children to be in Mr. Allen's company when she knew or should have known that he was likely to abuse them. Id. at 829–31. Relying in part on Elizabeth N., 9 Cal. App. 4th at 1234,[21] the court held that Ms. Allen's "continuing failure to prevent the child abuse was a single occurrence as to each child under the policy language." Id. at 834. Again, the court found that each child's abuse was a separate occurrence[22] even though the court was unwilling to find multiple occurrences per child based on Mr. Lynn's different acts of abuse. Id. And it is again notable that the court did not discuss any facts demonstrating that Ms. Allen had knowledge of the risk her husband posed to the children.

The Church has cited only one case in which a court held that one occurrence resulted from the abuse of multiple different children.[23] (ECF No. 42 at 24.) In Washoe County v. Transcontinental Insurance Co., over 40 children and their parents sued Washoe County for negligently licensing a day care center after the son of the owner, who was also an employee, sexually abused numerous children attending the day care center over a period of three years. 878 P.2d 306, 307 (Nev. 1994). The Supreme Court of Nevada held that the "County 'caused' the children's injuries through its failure to act with the requisite care in the process of licensing

---

[21] The court also cited the district court decision in Lee v. Interstate Fire & Casualty Co., 826 F. Supp. 1156 (N.D. Ill. 1993), which is curious because that case had been overturned by the Seventh Circuit, as discussed above. See Lee, 86 F.3d 101.

[22] The court provided no discussion about why the abuse of separate victims constituted separate occurrences. As a result, the case has limited persuasive value.

[23] The Church also cites a Sixth Circuit case holding that the abuse of multiple adults constituted a single occurrence under the terms of an insurance policy. (ECF No. 42 at 32 (citing Scott Fetzer Co. v. Zurich Am. Ins. Co., 769 F. App'x 322 (6th Cir. 2019)). The court discusses below why it finds this case unpersuasive. See infra, § I.E.

[the center].  Therefore, such failure must be considered the 'occurrence' for purposes of insurance liability."  Id. at 310.  Although the plaintiffs had also alleged that the County breached its duties to monitor the center's activities—an ongoing failure—, the Nevada Supreme Court's decision focused on the County's negligence in the licensing process.  Id. at 307, 310.  The case is therefore more like a negligent hiring case and less like a negligent supervision case.  And even though the outcome in Washoe County diverges from the outcome the court reaches here, the framework is consistent.  For instance, the Nevada Supreme Court's discussion of Insurance Corp. of America v. Rubin is instructive.  Id. at 308.  In Rubin, the Nevada Supreme Court decided whether there were multiple occurrences in a case involving a doctor who saw the same patient multiple times and consistently failed to diagnose that patient's brain tumor.  818 P.2d 389, 392 (Nev. 1991).  Noting that "Dr. Rubin made an independent evaluation upon each visit and different symptoms were revealed during each visit," the Nevada Supreme Court held that "under the causal approach, each diagnosis was a separate 'occurrence' for purposes of the insurance policy limit."  Washoe Cnty., 878 P.d at 308 (citing Rubin, 818 P.2d at 392).  In other words, the Nevada Supreme Court agreed that the number of occurrences under an insurance policy depended on the specific facts that gave rise to the insured's liability.

This court agrees with the Nevada Supreme Court's finding that "'occurrence' should be defined in such a way as to give meaning to the entity's connection to liability."  Id. at 310.  But the negligence at issue in Washoe County was, on balance, one discrete act at the time of licensing.  Here, by contrast, there was essentially a new act of licensing every time Mr. Jensen was referred for babysitting services to a new family.  The court finds that the Church's negligence was ongoing and specific to each victim because the Church knew about Mr. Jensen's abuse and failed to act throughout each of the incidents.

The court therefore finds that the cases on which the Church relies are either inconclusive or consistent with a finding that multiple occurrences arose from the facts at issue here. Reviewing the relevant caselaw as a whole, the court finds a presumption that the abuse of multiple victims constitutes multiple occurrences under insurance policies defining "occurrence" similarly. See H.E. Butt Grocery, 150 F.3d at 532 (collecting cases and finding that "most courts that have considered the question have concluded that the sexual molestation of different children constitutes separate occurrences"). Courts have been willing to override this presumption where the insured's negligence constitutes a discrete hiring decision (rather than ongoing negligent supervision) or otherwise resembles a single act because the insured received no warnings about the danger. See Washoe Cnty., 878 P.2d at 310; Lee, 86 F.3d at 105 (holding that Rhode Island courts would not treat negligent supervision as "invariably one 'occurrence'" where the insured received "no danger signals"). And while courts have struggled with the precise contours of this analysis where there is only one victim who suffers multiple incidents of abuse, the broad consensus that multiple occurrences arise from the abuse of different victims supports the court's finding that the policies' definition of "occurrence" is not ambiguous as it applies to multiple victims.

The Church disagrees, maintaining that the policies are susceptible to more than one interpretation and should be construed in favor of the insured. Before turning to these arguments, the court notes that much of the disagreement in this area of law stems from differences in how courts have labeled the theory under which they decide similar cases, even while reaching similar outcomes. Accordingly, the court first considers the Church's argument about whether the Utah Supreme Court would employ a cause test or an effects test in the insurance context.

### D. The Cause Test

The Church argues that a finding that multiple occurrences arose due to Mr. Jensen's

discrete acts of abuse amounts to the inappropriate use of an "effects test" rather than the more

conventional "cause test":

> There are two key competing approaches for determining the number of
> occurrences for purposes of liability: (1) the "cause" approach, and (2) the
> "effects" approach. The prevailing view looks to the "cause" or "causes" of the
> damage to determine the number of occurrences. Courts that employ this "cause"
> theory consider whether there is a single cause or multiple causes for the losses
> sustained. Conversely, courts that employ the "effects" approach calculate the
> number of occurrences by looking to the effect of the accident or, in other words,
> how many individual claims or injuries resulted therefrom. The "effects"
> approach has been applied by a minority of courts.

Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 293 (Pa. 2007).

While the court agrees with the Church that the Utah Supreme Court would likely apply a

cause test, not an effects test, to resolve the question of how many occurrences arose within the

meaning of the insurance policies, the court disagrees that its approach is anything other than a

"focus on the act of the insured that gave rise to their liability." Id. at 295.

A few examples will help clarify the difference between a cause test and an effects test.

In this case, the parents of Mr. Jensen's victims unquestionably suffered harm as a result of the

abuse of their child or children. But the abuse suffered by C.H., for instance, is not an instance

of multiple occurrences simply because C.H.'s parents were also harmed. If it were utilizing an

effects test, the court would find three victims who suffered due to C.H.'s abuse, and therefore

three occurrences. But because C.H.'s abuse arose out of one discrete incident, the court finds

there was only one occurrence under the policy. The Church may appropriately aggregate the

settlement amounts it paid to C.H. with the settlement amounts it paid to C.H.'s parents to

exhaust the retained limit.

Similarly, the court finds that the abuse of sibling pairs who were abused during the same encounter constitutes one occurrence, not two. The settlement reached in this case included payments for the abuse of two sets of siblings: 1) brothers Z.W. and A.W. and 2) brothers J.T. and W.T. Mr. Jensen abused Z.W. and A.W. on multiple occasions (see W. Va. Am. Compl. ¶ 90), raising the more difficult question of whether each encounter was a separate occurrence. But focusing on the one incident in which J.T. and W.T. were abused (see id. ¶ 87), or on any one incident involving the W. brothers, the court finds that an episode of abuse involving multiple victims does not create multiple occurrences. A jury that found the Church liable for J.T.'s abuse, for instance, would invariably find the Church similarly liable for W.T.'s abuse. That finding of negligence is premised on exactly the same facts, as the abuse of both brothers occurred at the same time, in the same place, and during the same encounter.[24] Absent an extraordinary showing that an insured's negligence caused the abuse of one victim but not another during an incident that involved the abuse of multiple victims, a liability-focused assessment of cause results in a finding that the incident constituted one occurrence. In contrast, a court applying an effects test would find that such an incident constituted two or more occurrences, depending on the number of victims.

The court's approach is therefore consistent with the Baumhammers case. In Baumhammers, the Supreme Court of Pennsylvania found that only one occurrence arose where the parents of Richard Baumhammers acted negligently by failing to take away Mr.

---

[24] Although the court finds that the abuse of J.T. and W.T. amounts to one occurrence, the settlement the Church reached with these brothers and their parents (███████) is not sufficient to exhaust the retained limit under ACE's policy. Similarly, even if the court found that the multiple instances of abuse suffered by Z.W. and A.W. amounted to one occurrence, the settlement amount for those brothers and their parents (███████) is below the retained limit. (See ECF No. 51-18.)

Baumhammers's gun.  Baumhammers, 938 A.2d at 291, 296.  Mr. Baumhammers went on a shooting spree, killing five people and seriously injuring a sixth.  Id. at 288.  The Pennsylvania Supreme Court held: "Parents' alleged negligence in failing to remove Baumhammers [sic] weapon and/or alerting the authorities as to his dangerous propensities is the 'occurrence' that began the sequence of events that resulted in the eventual injuries to Plaintiffs."  Id. at 296.  That outcome makes sense as a liability-focused assessment of cause.  Although there were multiple victims, the facts that support a finding that the parents breached their duty of care to the first victim are the same facts that support a finding of liability towards the other victims because the shooting spree occurred within the space of two hours.  Id. at 288.  This analysis would be wholly different if, having shot just one victim and returned home, Mr. Baumhammers's parents had helped him escape detection (or simply failed to ask questions despite suspicious circumstances) and he had then shot another person several months later.

Here, the court focuses on the facts that led to the Church's liability—liability that depends on both the Church's knowledge and inaction and Mr. Jensen's specific acts of abuse.  If the Church had not been negligent, it would not have been required to pay any settlement amounts.  And if Mr. Jensen had not committed the abuse, there would have been no damage to begin with.  It is the combination of these factors that caused the Church's liability, not the Church's negligence or Mr. Jensen's actions alone.  See Archdiocese of Portland, 35 F.3d at 1329 ("[I]t is the repeated 'exposure' of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification.").  Where the Church's liability is premised on the same facts (for instance, the abuse of siblings J.T. and W.T.), the court finds one occurrence under the policies.  But where the Church's liability depends on different underlying

facts (for instance, the abuse of P.C. and the abuse of A.B., occurring roughly four years apart and in different locations), the court finds multiple occurrences.

Courts have debated the appropriate theory under which they should consider insurance cases involving sexual abuse claims. The court finds instructive the debate noted above between two judges in the <u>H.E. Butt Grocery</u> case. One of the concurring judges on that panel, the Honorable Fortunato Benavides, wrote separately to state his disagreement with the framework under which the Honorable Emilio M. Garza decided the case: "I would hold that the appropriate test for counting occurrences under Texas law is a 'liability-triggering event' test rather than the 'immediate cause' test applied by Judge Garza." 150 F.3d at 535. Judge Garza found that "the two independent acts of sexual abuse 'caused' the two children's injuries and gave rise to HEB's separate and distinct liability in each case." <u>Id.</u> at 531. Judge Garza disagreed with Judge Benavides's suggestion that "examining the 'cause' of the injuries and examining the events 'giving rise' to liability are mutually exclusive tests for determining the number of 'occurrences.'" <u>Id.</u> at 530 n.2.

This court agrees that Judge Garza and Judge Benavides utilized a cause test and not an effects test. Whereas Judge Garza focused on the immediate cause that injured the victims (the assault), Judge Benavides focused on the cause of liability from the perspective of the insured.[25] These frameworks yielded the same result because "the events that gave rise to liability, even from HEB's point of view, were the employee's molestations of each child." <u>Id.</u> at 536 (Benavides, J., concurring). Although the two approaches will often yield the same result (and

---

[25] Indeed, the courts in the cases favored by the Church and those favored by the insureds have all used a cause test. The real difference between these cases (whether discussed in these terms or not) is whether the court used an immediate cause test or some form of a liability-focused assessment.

would in the case of Mr. Jensen's abuse), the court finds that Judge Benavides's approach is more helpful to explain the outcomes in cases involving both sexual abuse and other events for which an insured seeks liability coverage. After all, there are various theories of liability under which an insured may face litigation or enter into a settlement, and importing concepts of causation from tort law may result in a mismatch.

For instance, the Ninth Circuit held that separate civil rights suits based on the alleged use of excessive force by various police officers nevertheless involved only one occurrence under the relevant insurance policy. Mead Reinsurance v. Granite State Ins. Co., 873 F.2d 1185, 1188 (9th Cir. 1988). That result is inconsistent with an "immediate cause" test, which would look at each precipitating use of excessive force. But the holding does follow logically after considering what triggered the insured's liability. The insured was a municipality, and municipal liability under 42 U.S.C. § 1982 is premised on a policy or custom. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). As the Ninth Circuit explained:

> Liability under 42 U.S.C. § 1983 does not arise from each separate act of police misconduct, but the underlying municipal policy of condoning a series of similar police acts. Therefore, the alleged policy of condoning police brutality constitutes a "single occurrence" for purposes of establishing the insurer's liability under the "per occurrence" clause of the respective polices.

Mead Reinsurance, 873 F.2d at 1188.

A "liability-triggering event" test also explains the difference between cases involving negligent supervision and those involving negligent hiring. See Washoe Cnty., 878 P.2d at 310. In both types of cases, the immediate cause of a victim's injuries is the specific assault against that victim. But the events triggering the insured's liability are different. In a negligent hiring case, the insured negligently failed to perform a discrete act of exercising due care and diligence when hiring someone who later committed abuse. In a negligent supervision case, by contrast,

31

the insured's negligence continues to change over time, and whether the insured is liable to each victim depends on the specific circumstances that led to that victim's abuse.

This court predicts that the Utah Supreme Court would utilize a version of the cause test focused on the event that triggered an insured's liability. This framework accounts for both the insured's negligence and the specific act of abuse—as absent either condition, the insured would not be found liable and there would be no loss under the policy. But the test recognizes that, outside a scenario in which an insured has no notice of the abuse, the facts establishing the insured's liability for negligence are distinct for each discrete act of abuse.

### E. Ambiguity

The Church argues that, even if the court disagrees with the Church's interpretation of the word "occurrence," the term is nevertheless susceptible to multiple interpretations and therefore ambiguous. And under Utah law, "ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage." U.S. Fidelity, 854 P.2d at 522–23 (citations omitted). In support of this position, the Church cites a Sixth Circuit case holding that a company's negligence in connection with the sexual assaults against three separate women by a company-affiliated distributor[26] amounted to only one occurrence. Scott Fetzer Co. v. Zurich Am. Ins. Co., 769 F. App'x 322, 328–29 (6th Cir. 2019). Applying Ohio law, the Sixth Circuit relied heavily on a state court case stating that, "if an insurer wants to interpret a clause in an insurance contract so as to defeat coverage, 'it must demonstrate that the clause in the policy is capable of the construction it seeks to give it, and that such construction is the only one that can be fairly placed upon the language." Id. at 326 (citing

---

[26] The company did not directly employ the man who committed the assaults, but its relationship with him "was substantial enough to motivate [the company] to enter into settlement agreements with the three women." Fetzer, 769 F. App'x at 324.

Bosserman Aviation Equip., Inc. v. U.S. Liab. Ins. Co., 915 N.2d 687, 692–93 (Ohio Ct. App. 2009) (emphasis added by the Sixth Circuit)).  Although the Sixth Circuit noted that the insured's interpretation of the contract was "semantically awkward[,]" the court found that the company "need[ed] only to prove its reading is a reasonable one."  Id. at 327.

The court declines to follow the Sixth Circuit for several reasons.  First, the court finds that the policy language is not ambiguous—at least not where there were multiple victims abused at separate times, and especially where the insured received warnings about the abuse.

Moreover, even if the court were to find that the phrase "each occurrence" was susceptible to more than one interpretation, it is unclear what it means to interpret this language in favor of the insured.  That is because the phrase "each occurrence" affects the amount of coverage under the policies in multiple ways.  As noted, the policies provide for a retained limit of ██████ "[e]ach [o]ccurrence[.]"  (See, e.g., ECF No. 56-3 at 30.)  But the policies also limit the amount of coverage available to a cap of "██████ [e]ach [o]ccurrence[.]"[27]  (See, e.g., id. at 2 (listing the "Limits of Insurance").)  Whether a finding of one occurrence or multiple occurrences favors the insured therefore depends entirely on the structure of settlement payments.  Consider an example in which the insured settles with two victims of abuse for ██████ each.[28]  If the court found that there were one occurrence, the insured would only have to satisfy one retained limit (i.e., the insured would be responsible for ██████ of the

---

[27] The parties have not argued that any potential recovery for the Church must be capped at ██████  But it is unclear why the Church could receive an amount in excess of this limit, even if the court found that the multiple incidents of abuse arose out of only one occurrence.  The Church could conceivably argue that the insurance cap only applies to bodily injury suffered during the policy period.  But it would be inconsistent to hold that the court may apportion an "each occurrence" retained limit across multiple policies even though it may not similarly apportion an "each occurrence" insurance cap.

[28] For simplicity, the court assumes that the abuse all occurred within the same policy period in this example.

overall ██████ settlement).  But because the policy caps the available insurance at ██████ , the insured would only receive ██████ .  In contrast, if the court found that there were two occurrences, the insured would have to satisfy two retained limits (i.e., the insured would be responsible for ██████ of the overall ██████ ).  But the insurer would pay up to ██████ for both occurrences, thereby paying the insured a total of ██████ .  Clearly, the insured would argue that the abuse constituted two occurrences in this scenario.

> The Seventh Circuit has made this point explicitly:
>
> [W]hat it means to construe [the definition of "occurrence"] against the author is itself ambiguous.  Winners and losers will change with the circumstances. Interstate today wants to call sustained sexual abuse multiple occurrences to increase the number of deductibles the Diocese must cover and the number of contributions the primary carrier must make.  But if tomorrow the victim's loss exceeds the maximum coverage for a single occurrence, the roles will be reversed. The excess carrier would want to call the sexual abuse a single occurrence to cap its own exposure, while the Diocese would favor multiple occurrences in order to maximize its insurance coverage.

Lee, 86 F.3d at 104; see also H.E. Butt Grocery, 150 F.3d at 535 ("[T]he cases make clear that whether the definition of 'occurrence' is favorable to the insured depends on whether the parties are arguing over the maximum coverage per occurrence or the number of self-insured retentions that must be paid.").

The court finds that the "each occurrence" language is not ambiguous for situations involving multiple victims who were abused in separate incidents.  To the extent that it is unclear how this language should apply to multiple instances of abuse against a single victim (or multiple victims who were abused in the same incident), the court strives to interpret this language uniformly with other courts that have considered the issue and declines to adopt an interpretation of "occurrence" that would shift in meaning between insureds who wish to avoid the application of multiple retained limits and insureds who wish to avoid the application of a

liability cap.  The court therefore need not consider the additional arguments presented by the insurers—namely, that the general rule to construe coverage in favor of the insured does not apply because a retained limit is a condition precedent to coverage and because the retained limit endorsement is a "manuscript endorsement" negotiated by an insurance broker on behalf of the Church.  (See ECF No. 70 at 18–20.)

### F.  Changed Language in ACE's 2012 Policy

ACE's 2012 Policy, unlike the other ACE policies at issue, specifies that the retained limit specifically for coverage of sexual abuse and molestation claims is ███████ "each claimant."  (ECF No. 56-8 at 62.)  The Church points to the changed language as a smoking gun to suggest that the earlier policies did not contain a retained limit for each claimant, but rather one retained limit for the Church's overarching negligence.  In other words, the Church suggests that the changed language is an admission that there was only one occurrence under the previous policies.

While the court agrees that the 2012 Policy provides clarity, the reasons why ACE changed its policy language are not before the court.  In any event, the change does not simply limit liability coverage, as the Church suggests.  The additional language also provides less coverage for a scenario in which multiple victims are abused during the same encounter.  For instance, the court has found that the Church may appropriately aggregate the settlement amounts paid to J.T., W.T., and their parents, as these brothers were abused during the same incident and their abuse constitutes one occurrence.  Under the previous policies, the Church would have to exhaust one retained limit of ███████ before triggering coverage.  Under the 2012 Policy, the Church would have to exhaust at least two retained limits, as both brothers are

claimants (and potentially more retained limits, as the parents also suffered as a result of the abuse).

Further, the 2012 Policy does not merely clarify that the retained limit applies to each claimant; there is also a new Sexual Abuse Coverage endorsement containing extensive modifications of the policies' provisions on defense and supplementary payments, limits of insurance, exclusions, and definitions.  (Id. at 62–66.)  The court declines to interpret the previous ACE policies based on the Sexual Abuse Coverage endorsement of the 2012 Policy where that endorsement affects multiple aspects of the insurance coverage provided.  For these reasons, the court is not persuaded that the amended language in ACE's 2012 policy alters the court's analysis of the coverage provided by the previous policies.

### G.  Arguments the Court Need Not Address

Because the court predicts that the Utah Supreme Court would find that multiple occurrences arose from the underlying facts, the Church failed to exhaust the policies' applicable retained limits.  Consequently, the Defendants did not owe the Church any duties to indemnify.  Nor did the Defendants breach the covenant of good faith and fair dealing.  And because the court's holding on the number of occurrences is dispositive, the court need not discuss several additional arguments made by the parties.

First, the court does not address two arguments made by National Union: 1) that the Church is estopped from seeking defense and indemnification under its policy; and 2) that the Church's breach of the National Union policy's voluntary payments provision bars the Church from seeking National Union's indemnification.  (ECF No. 50 at 20, 28.)  Second, the court denies the Church's requests for declaratory judgments against both defendants stating that

Exclusion K does not apply[29] and a declaratory judgment against ACE stating that its known loss

or loss in progress doctrines do not preclude coverage.  (ECF No. 42 at 30–38.)  Third, the court

need not decide whether A.W., who was forced to watch the abuse of his brother, also

experienced "bodily injury" under ACE's policy.  (ECF No. 68 at 28–30.)  Even if the court

aggregates all settlement amounts received by A.W., his brother, and his parents, the Church did

not exhaust the applicable retained limit.

Finally, the court does not address the Church's theory of apportionment based on <u>PECO</u>

and other cases.  While that theory may be useful where the court finds that bodily injuries

stemming from one occurrence span multiple policy periods, the court has found there were

multiple occurrences here.

## H.  Conclusion

Based on the umbrella policies' language, the underlying facts, and relevant caselaw, the

court predicts that the Utah Supreme Court would hold that multiple occurrences arose from the

underlying claims against the Church.  Once the Church had knowledge that Mr. Jensen posed a

risk of abuse to Church members, the Church had a duty to its members to prevent the abuse.

The Church had multiple opportunities to act and failed to do so.  Accordingly, there was a

distinct occurrence under the policies each time Mr. Jensen abused a child or pair of siblings.

And because the Church did not exhaust its retained limit for any of these occurrences, the

insurers had no duty to indemnify the Church for any settlement payments.

---

[29] National Union's Exclusion K states: "This insurance does not apply to Bodily Injury and
Property Damages expected or intended from the standpoint of the insured …."  (ECF No. 56-2
at 10.)  ACE's policies provide that the insurance does not apply to "K. 'Bodily injury' …
expected or intended from the standpoint of the 'insured.'"  (ECF No. 56-3 at 11.)

## II. Exhaustion under National Union's Policy

Even if the court rules that multiple occurrences arose under the relevant policies, the Church argues that it has nevertheless exhausted its policy with National Union. The Church maintains it may apply payments made as the result of "auto liability" claims to exhaust National Union's ██████ retained limit for "general liability coverage." Specifically, the Church asserts that it paid ████████ to resolve auto liability claims (see Claims Paid Between 2006–2007, Ex. 25 to Klie Decl., ECF No. 51-25), and that it may combine that payment with the ██████ payment made to settle P.C.'s claims to satisfy National Union's retained limit for general liability coverage.

National Union's policy, in pertinent part, provides that:

> Z. Retained Limit means the applicable limit(s) listed in the Schedule of Retained Limits. The Retained Limit(s) listed in the Schedule of Retained Limits will apply whether or not there is any available Scheduled Underlying Insurance or Other Insurance …[30]

> The above Retained Limit may be reduced or exhausted by:

> 1) Any payment by or on behalf of the Insured of loss that would be insured by our policy within the above Retained Limits, and/or

> 2) Any payment by any insurer under any policy[] of insurance available to the Insured of Loss that would be insured by our policy within the above Retained Limits. However, this provision does not apply to any policy of insurance specifically purchased to be in excess of this policy.

(ECF No. 56-2 at 65.) National Union's Schedule of Retained Limits lists the "Retained Limit" for each type of coverage under the policy, with separate entries and limits for Auto Liability and General Liability. (Id. at 67.) The retained limit for auto liability notes that it applies per "combined single limit." (Id.)

---

[30] The availability of any "Scheduled Underlying Insurance or Other Insurance" is not an issue before the court.

Under the policy's plain terms, the Church cannot mix and match applicable retained limits from its Auto Liability policy with its General Liability policy. Coverage for the minor plaintiffs' injuries depends on the exhaustion of the General Liability retained limit under National Union's policy: ███████ per occurrence. The General Liability retained limit may only be reduced or exhausted by "any payment by or on behalf of the Insured of loss that would be insured by [National Union's] policy within … [that] [l]imit[.]" But that limit is "the applicable limit[]," not other retained limits that the policy lists. Id. In other words, the Church cannot apply damages payments made to resolve auto liability claims— subject to the auto liability retained limit, which limits coverage on a "combined single limit"—to exhaust the retained limit for general liability coverage.

The Church's reliance on Indemnity Insurance Co. of North America v. W & T Offshore, Inc. to support its interpretation of National Union's policy is misplaced. 756 F.3d 347, 349 (5th Cir. 2014). The issue in W & T Offshore was not whether an insured party could exhaust a policy's "each occurrence" retained limit by using payments made for injuries subject to a separate retained limit. Rather, the parties in that case disputed whether the four umbrella policies at issue took effect. The umbrella policies defined "Retained Limit" as "the greater of (1) the amount of underlying insurance or (2) the amount of [the self-insured retention] that is not covered by the underlying insurance." Id. at 353. The greater amount—the applicable retained limit—was the "total of the applicable limits of the underlying policies listed[:]" $161 million dollars. Id. The umbrella policies did not qualify how the retained limit for the underlying/primary insurance policies "must be paid or that it must be met with claims covered under the Umbrella Policy; it simply states that it must be met." Id. at 354. The Fifth Circuit sided with the appellee, W & T Offshore, and held that the umbrella insurance policies took

effect once all underlying/primary insurance was exhausted, no matter how that exhaustion

occurred, because "[n]othing in the text of the Coverage provision or the definition of the

Retained Limit specifies how the $161 million 'limit' … must be reached or states that the

Retained Limit refers exclusively to sums covered by the [u]mbrella [p]olic[ies]." Id. at 352–53.

National Union's policy is distinguishable from the policies in W & T Offshore because National

Union's policy specifies how the applicable retained limit must be met: through the General

Liability coverage (and not the combined General Liability and Auto Liability coverage).

Accordingly, the Church's alternative argument that it exhausted the retained limit in

National Union's policy fails.  The retained limit for losses arising out of the Church's

negligence in a sexual abuse claim cannot be reduced by the retained limit for an Auto Liability

policy.

## III.  Duty to Defend

The Church seeks a declaratory judgment from the court stating that National Union

and ACE owed the Church a duty to defend against the underlying lawsuit, thereby seeking

reimbursement for its defense costs.  National Union and ACE argue that their duties to defend

never arose because the Church did not exhaust the retained limits set forth in the policies.  (ECF

Nos. 47 & 50.)

When conducting a duty-to-defend analysis, the Utah Supreme Court looks at the

insurance policies and the underlying complaint.  Benjamin v. Amica Mut. Ins. Co., 140 P.3d

1210, 1214 (Utah 2006).  "To avoid the duty to defend, … the insurer must show that none of the

allegations of the underlying claim[s] [are] potentially covered [under the relevant insurance

policy] (or that a policy exclusion conclusively applies to exclude all potential for such

coverage).”  <u>Owners Ins. Co. v. Greenhalgh Planning & Devel., Inc.</u>, No. 22-4008, 2023 WL

4994512, at *2 (10th Cir. Aug. 4, 2023) (citation omitted) (applying Utah law).

Because the duty to defend is contractual, the court's analysis begins with the policies.

<u>See</u> <u>Benjamin</u>, 140 P.3d at 1214.  National Union's policy provides that it "will have the right

and duty to defend any Suit against the Insured that seeks damages for Bodily Injury … covered

by this policy, even if the Suit is groundless, false or fraudulent <u>when the applicable limits listed</u>

<u>in the Schedule of Retained Limits have been exhausted by payment of Loss to which this policy</u>

<u>applies</u>."  (ECF No. 56-2 at 75 (emphasis added).)  ACE's policies similarly provide that:

> Whenever any 'insured's' 'retained limit' applies, [ACE] shall not be obligated to defend or assume charge of the investigation or of the settlement or defense of any 'suit' brought against the 'insured.'  However [ACE] shall have the right and be given the opportunity to be associated in the defense and trial of any 'suits' relative to any 'occurrence' which, in [ACE's] opinion, may create liability on [ACE's] part under the terms of this policy.
>
> [ACE] will assume charge of the settlement and defense of any 'suit' brought against the 'insured' to which this policy applies and <u>to which no 'insured's' 'retained limit' stated above applies because of the exhaustion of the applicable limits.</u>
>
> If [ACE] assumes any right, opportunity or obligation, [ACE] shall not be obligated to defend any 'suit' after the applicable limits of this policy have been exhausted.

(ECF No. 56-3 at 31 (emphasis added).)[31]

As discussed above, the underlying plaintiffs have not alleged claims potentially covered

by the policies because, regardless of whether the plaintiffs could prove the allegations against

the Church, no coverage was due under the policies until the Church exhausted the policies'

---

[31] The duty to defend language of ACE's 2010 policy differs from the duty to defend language in the other ACE policies at issue.  That policy directs that ACE's duty to defend and indemnify applies when "the applicable limits listed on the Schedule of Retained Limits have been exhausted by payment of 'loss.'"  (ECF No. 56-5 at 46.)  This difference is immaterial.

applicable retained limits.  As prescribed by the policies, the insurers' duties to defend never arose because the Church did not exhaust the retained limits for general liability coverage.

Consequently, the Church is not entitled to a declaratory judgment stating that the insurers had duties to defend.

## ORDER

The court predicts that the Utah Supreme Court would hold that multiple occurrences arose from the underlying facts.  The insurers did not owe the Church a duty to defend or indemnify under any implicated policy.  As a result, National Union and ACE did not breach their contractual obligations to the Church under any policy or the implied covenants of good faith and fair dealing inherent in the contracts they entered into with the Church.  For these reasons, the court ORDERS as follows:

1.    The court DENIES the Church's motions for partial summary judgment (ECF Nos. 42 & 43).

2.    The court GRANTS National Union's and ACE's motions for summary judgment (ECF Nos. 47 & 50).

DATED this 28th day of March, 2025.

BY THE COURT:

Tena Campbell
United States District Judge